Filed 4/9/14  P. v. Padilla CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C066957 |
| v. | (Super. Ct. No. 09F05005) |
| ESCARDO PADILLA, | |
| Defendant and Appellant. | |

A jury convicted defendant Escardo Padilla of attempted murder (Pen. Code, §§ 187, 664)[1] and found he personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b), (c), & (d)).  The jury additionally found defendant committed the offense for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1).)  The trial court sentenced defendant to serve an aggregate term of 42 years to life in state prison.

---

[1]     Undesignated statutory references are to the Penal Code.

1

On appeal, defendant contends (1) his conviction of attempted murder must be reversed because the evidence was insufficient to establish he acted with intent to kill, and (2) insufficient evidence of predicate offenses requires us to strike the gang enhancement imposed under section 186.22, subdivision (b).

We conclude the evidence sufficed to prove defendant acted with intent to kill and to establish the two predicate offenses required for the gang enhancement. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

*The Shooting*

On the afternoon of July 4, 2009, Richard Horgan, Michael Dominguez, and Juan Osoria[2] went to the Sunrise Vista Apartment complex to hang out with Ana Juarez, Deysi Juarez, and Dulce Aguilera. At approximately, 8:00 p.m., the group walked to the pool area to meet up with defendant, who was Ana's boyfriend.[3] Defendant was wearing the sort of tall socks favored by Sureño gang members. He had previously told Aguilera he was a member of the Original Gangster Sureños (OGS). Dominguez, who admitted he associated with Sureño gang members, knew defendant only by his gang moniker, Puppet.

At some point, Dominguez told defendant "that there was a possible problem that was going on" because of previous conflicts with Ana's neighbor and the neighbor's friends. Defendant responded that he had a gun on him "and that if anything . . .

---

[2] Horgan and Dominguez were charged with the same offenses as alleged against defendant. Horgan and Dominguez both entered negotiated pleas to assault with a deadly weapon and admitted the gang enhancement. Horgan additionally pled to the firearm enhancement. Both plea agreements were conditioned on Horgan and Dominguez testifying truthfully at defendant's trial.

[3] Due to a shared surname with her sister, Deysi, we refer to Ana by her first name.

happened, if they started trouble, that if he had to he would use it."  The group started to walk through the parking lot to meet some of defendant's friends at a nearby bar.  The group stretched into a long line as they walked, with Ana and defendant leading the way.

The parking lot of the apartment complex had begun to fill with people who came to watch the fireworks display at the adjacent Sunrise Mall.  Horgan heard several Hispanics yelling at defendant, "fuck scraps."  "Scraps" is a derogatory term for members of the Sureño gang.  Defendant responded by saying, "fuck busters" or "fuck chaps."  "Busters" and "chaps" are derogatory terms for members of the Norteño gang.

Defendant began to argue with a man, later identified as Miguel Samora, who appeared to be a Norteño due to his red flannel shirt.  Samora appeared to want to fight defendant, but Samora's girlfriend held him back while Ana tried to hold defendant back.  Samora began to walk away, but saw Horgan and began to argue with him.  Horgan told him to calm down and he did not want to fight because there were girls around.  Samora took a swing at Horgan and they began to fight.  Samora's older brother joined the fight.  Meanwhile, some men dressed in red ran up to Dominguez.  Dominguez told them he "didn't want no problems" and did not want to fight.  But when it looked like one of the men was about to hit him, Dominguez punched him.

Defendant told Aguilera he "need[ed] to, 'end this' because 'it will start up again.' "  According to Dominguez, defendant "came out of nowhere," ran to the middle of the parking lot, and fired his gun into the air.  Dominguez testified, "People sort of froze and the fight discontinued for a second."  Samora stopped fighting with Horgan and began to head toward defendant.  Defendant said, "[T]his is Puppet -- OGS gang."  Immediately after saying this, defendant took a step toward Samora "coming close" and fired two or three shots at him.  Defendant then said, "Big Sur Trece."  One of the bullets hit Samora in the center of his chest approximately eight inches below the lower part of

3

the breastbone. Horgan testified he saw Samora "had a hole in his chest." Another bullet hit Samora in his right elbow. A third bullet hit bystander, Felix Gomez, in the stomach.[4]

After defendant fired the shots, he gave the gun to Ana and took off running.

### *Gang Evidence*

Michelle Perez, a gang detective for the City of Citrus Heights, testified as an expert on the Norteño and Sureño gangs. She explained that Bakersfield serves as an approximate boundary between the two gangs, with the Norteños generally claiming territory to the north and Sureños to the south. Nonetheless, Sureños frequently live in Sacramento when their families find work in the area.

The Norteño and Sureño gangs have subsets, such as the OGS, that lay territorial claim to a particular neighborhood. There are several subsets of both gangs in the Sacramento area. However, regardless of subset, Norteños and Sureños are "mortal rivals."

Members of rival gangs identify each other by their clothes, colors, and hairstyles. Sureños favor very short hair, the color blue, and the number 13. Sureño graffiti often includes "SUR," which means south in Spanish. Norteños identify with the color red, hair shaved except for a ponytail, and the number 14. Gang members also often have tattoos that identify their membership.

The concept of respect is tremendously important to gang members. If a gang member receives a "wrong" look and feels disrespected by a member of a rival gang, violence is likely to ensue. Respect within a gang is equally important. To be respected or "promoted" within the gang, a gang member must commit violent acts. As Perez testified, "one of the most respected gang members is probably going to be the person

---

[4] The jury was unable to reach a verdict on the charge defendant attempted to murder Gomez.

4

that commits the most violent acts." Also, gang members "look up to someone who has a gun and is willing to use it." Thus, when committing a violent crime, gang members will announce themselves and their gang affiliation to gain credit for their offenses.

According to Perez, the Sureños and Norteños meet the definition of a criminal street gang. Some of their primary activities are homicides, felony assaults, robberies, burglaries, auto theft, and weapons possession. As to the Sureños, Perez gave two examples of felonies committed by Sureño gang members. First, she described an attempted murder in February 2007 when three Sureño gang members –- Jonathan Sanchez, Jose Rivera, and Luis Martinez –- got into a fight with two Norteño gang members –- Joseph Bustos and Christopher Garcia. During the fight, Martinez was shot in the leg. In retaliation, Sanchez and Rivera drove to Garcia's house and began shooting at Garcia and his pregnant girlfriend. According to Perez, "a moving gun battle" ensued and ended with Sanchez being shot in the leg.

Perez recounted a second example of Sureño gang activity that occurred on June 26, 2007. On that date, a gang fight erupted at Luther Burbank High School. During the fight, a Sureño gang member was identified as a student who had recently been expelled from the school. The police obtained consent from the gang member's mother to search his bedroom at home. When the police searched the bedroom, the gang member admitted he had hidden a shotgun in the attic. The gun was intended to serve as protection against Black gang members who had threatened him.

Perez opined defendant is a Sureño gang member who identifies with the OGS subset. She noted defendant had previously admitted to police officers to being a Sureño gang member in 2007 and 2010.

DISCUSSION

**I**

### *Sufficiency of the Evidence Regarding Intent to Kill*

Defendant contends insufficient evidence of intent to kill Samora supported his conviction of attempted murder. We reject the contention.

**A.**

### *Standard of Review for Claims of Insufficient Evidence*

The California Supreme Court has instructed that "[i]n assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) . . . The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' (*Id.* at pp. 792–793.)" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

**B.**

### *Attempted Murder Requires Proof of Intent to Kill*

" '[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Smith*

(2005) 37 Cal.4th 733, 739 (*Smith*), quoting *People v. Lee* (2003) 31 Cal.4th 613, 623.) As the *Smith* court explained, "it is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. (See *People v. Lee* (1987) 43 Cal.3d 666, 679.) 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. (*People v. Lashley* [(1991)] 1 Cal.App.4th [938,] 946.) The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." (*Id*. at p. 945.)' (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 (*Chinchilla*); see also *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224–1225.) ' "The fact that the shooter may have fired only once and then abandoned his [or her] efforts out of necessity or fear does not compel the conclusion that he [or she] lacked the animus to kill in the first instance. Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind." ([*People v. Lashley, supra*, 1 Cal.App.4th] at p. 945.)' (*Chinchilla*, at p. 690.)" (*Smith*, at p. 741.)

## C.

### *The Evidence Sufficed to Show Defendant Intended to Kill Samora*

Viewing the evidence in the light most favorable to the judgment, the evidence at trial sufficed to show defendant fired his gun at Samora with intent to kill. Both defendant's statements and conduct at the time of the shooting supported the jury's conclusion that defendant shot Samora with homicidal intent.

Several witnesses testified that defendant leveled his gun at Samora and fired two or three shots. For example, Dominguez testified that defendant "held out his hand and just shot him." Horgan testified, "I seen Padilla kind of step a little forward. I didn't

know where he was, but I seen him step a little forward, you know, *coming close*" before defendant "put out his hand" and shot Samora. (Italics added.) As the Supreme Court in *Smith* noted, a shot fired at close range suffices to prove an intent to kill. (*Smith, supra,* 37 Cal.4th at p. 741.)

After defendant shot Samora in his abdomen and elbow, he announced "Big Sur Trece" –- "Sur" referring to the Sureño gang according to the prosecution's gang expert. Thus, defendant laid claim to his violent acts rather than demonstrating any surprise or remorse over the injury inflicted. In short, defendant's words and actions supported the inference he shot Samora with the intent required for attempted murder.

We reject defendant's argument that he acted solely in self-defense. We also disagree the first shot was intended to serve as a warning. The evidence at trial indicated defendant's firing into the air served to gain attention to the act he was about to commit as demonstrated by his stating his gang moniker and gang affiliation once everyone froze and looked at him. Moreover, even if the first shot served as a warning, defendant's act of leveling the gun at Samora and shooting him twice demonstrated an attempt to hit Samora.

We also note Samora was shot in his middle –- in the lower chest and in his elbow. The location of Samora's wounds demonstrates an intent to kill. "[A] factor indicating a killing is premeditated and deliberate is the existence of 'wounds [that] were not wild and unaimed but were in the area of the chest and heart.' " (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552, quoting *People v. Paton* (1967) 255 Cal.App.2d 347, 352.) Combined with Horgan's testimony that defendant stepped forward, coming close to Samora, before shooting, the jury had evidence to conclude defendant was aiming to kill. (*Smith, supra,* 37 Cal.4th at p. 741.)

Defendant argues Samora was not shot at sufficiently close range to invoke the inference that the shots were fired with an intent to kill. Although the exact distance

8

between defendant and Samora at the time of the shooting is not clear, multiple witnesses testified defendant lowered his gun and shot at Samora two or three times. Even if we ignore Horgan's testimony that defendant was "coming close" to Samora before shooting him, defendant's aiming the gun at him and the location of the victim's wounds support a finding of intent to kill. "While such evidence [of firing on a victim at close range] undoubtedly creates a strong inference that the killing was intentional (see *People v. Jackson* (1989) 49 Cal.3d 1170, 1201; *People v. Bloyd* (1987) 43 Cal.3d 333, 348; *People v. Wells* (1988) 199 Cal.App.3d 535, 541), it is not the exclusive means of proving so." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945.)

The evidence at trial supported a finding defendant attempted to kill Samora.

## II

### *Sufficiency of the Evidence for the Gang Enhancement*

Defendant contends insufficient evidence supported the gang enhancement allegation because the People failed to prove the Sureños constitute a criminal street gang having as one of its primary activities the commission of one or more criminal acts described in section 186.22, subdivision (e). Although defendant correctly points out that one of the two examples given by Perez did not qualify as a predicate offense, defendant's attempted murder of Samora qualified as the second predicate.

### A.

### *Criminal Street Gang Enhancement*

To prove the Sureños are a criminal street gang for purposes of the enhancement imposed under section 186.22, subdivision (b)(1), the People had the burden of proving that it has as one of its "primary activities" the commission of one or more of the crimes enumerated in subdivision (e) of section 186.22, and it has engaged in a "pattern of criminal gang activity" by committing two or more such "predicate offenses." (§ 186.22, subds. (e) & (f).) A " 'pattern of criminal gang activity' " is defined as "the commission

9

of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [the predicate offenses], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."  (§ 186.22, subd. (e).)

Expert testimony may be used to establish the elements of a gang enhancement.  (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330.)  To qualify as substantial evidence, expert testimony must be based on reliable information.  Police officers may base their testimony on conversations with gang members as well as information from colleagues and other law enforcement agencies.  (*Ibid*.; *People v. Gardeley* (1996) 14 Cal.4th 605, 619-620 (*Gardeley*).)

## B.

### *Predicate Offenses*

Here, the People elicited testimony from Perez that (1) an attempted murder was committed by Sureños in February 2007, and (2) unlawful possession of a shotgun was committed by a Sureño gang member in June 2007.  Defendant does not dispute the sufficiency of the evidence regarding the 2007 attempted murder as a predicate offense under section 186.22, subdivision (e)(3).  However, Perez's testimony about the 2007 possession of a shotgun by a Sureño gang member was insufficient to qualify it under subdivision (e)(23) of section 186.22.  That subdivision requires proof that a gang member was in "[p]ossession of a pistol, revolver, *or other firearm capable of being concealed upon the person*."  (Italics added.)  Perez's testimony did not touch on whether the shotgun's size rendered it capable of being concealed on a person.  Thus, the evidence was insufficient to establish the shotgun possession as a qualifying predicate offense.

The Attorney General concedes the insufficiency of the evidence regarding the shotgun possession, but argues the current attempted murder constitutes a qualifying

10

offense as does the 2007 attempted murder.  The point is well taken.  The two attempted murders provide the number of predicate offenses required for the gang enhancement.

In *Gardeley*, the California Supreme Court held the currently charged offense can be considered as one of the predicate offenses in establishing a pattern of criminal gang activity under section 186.22.  (*Gardeley, supra,* 14 Cal.4th at p. 624.)  The prosecution in *Gardeley* had shown the Family Cripp gang to which the defendant in that case belonged had previously been responsible for an incident of being an accessory to a felony (§ 32), possession of cocaine (Health & Saf. Code, § 11350), and shooting at an inhabited dwelling (§ 246).  (*Gardeley,* at p. 624.)  Of these three offenses, only shooting at an inhabited dwelling qualified as a predicate offense.  (§ 186.22, subd. (e)(5).)  *Gardeley* nonetheless affirmed the gang enhancement because the current offense –- assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245) –- did qualify under section 186.22, subdivision (e).  (*Id.* at pp. 610, 625.)  The *Gardeley* court concluded that "the prosecution established the requisite 'pattern of criminal gang activity' consisting of 'two or more' statutorily enumerated offenses that were 'committed on separate occasions, or by two or more persons.'  (See *People v. Olguin* [(1994)] 31 Cal.App.4th 1355, 1383 [holding the charged offenses can be considered in deciding upon the existence of a pattern of criminal gang activity]; *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1462 [same]; *In re Lincoln J.* (1990) 223 Cal.App.3d 322, 328 [same]; accord, *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1003.)"  (*Gardeley*, at p. 625.)  Under *Gardeley*, we conclude the current offense provides the second predicate offense necessary for the gang enhancement.

In his reply brief, defendant asserts the jury was not instructed on the evidence of the current offense as a predicate for the gang enhancement.  Here, the jury was instructed with CALCRIM No. 1401, which stated that "[a] pattern of criminal gang activity" for purposes of the gang enhancement included "[t]he commission of, attempted

11

commission of, conspiracy to commit, or conviction or juvenile adjudication of attempted murder." The jury was further instructed that "[t]he most recent crime [must have] occurred within three years of one of the earlier crimes." Thus, the jury was instructed on both qualifying predicate offenses in this case. Here, as in *Gardeley*, the current offense supplies the second predicate offense for purposes of section 186.22. (*Gardeley, supra,* 14 Cal.4th at pp. 624-625.)

DISPOSITION

The judgment is affirmed.

HOCH , J.

We concur:

RAYE , P. J.

HULL , J.

12