Filed 9/2/14  P. v. Tracey CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>LONNIE PAUL TRACEY,<br><br>　　　　　　Defendant and Appellant. | B249217<br><br>(Los Angeles County<br>　Super. Ct. No. PA071529) |

APPEAL from the judgment of the Superior Court of Los Angeles County. David B. Gelfound, Judge.  Affirmed.

Law Offices of Anthony D. Zinnanti and Anthony D. Zinnanti for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * * * * * *

In the fall of 2011, defendant and appellant Lonnie Paul Tracey fatally shot his next door neighbor, Anthony Davis, with whom he had an acrimonious relationship for a number of years. At his criminal trial, defendant testified he shot Mr. Davis in self-defense, not realizing it was him, but believing Mr. Davis to be a prowler who posed a threat to him and his wife. A jury convicted defendant of the first degree murder of Mr. Davis. The jury also convicted defendant of assault with a firearm on Mr. Davis's wife, Cindy Davis.

In this appeal, defendant claims: (1) there is insufficient evidence of premeditation and deliberation to support the jury's first degree murder finding; (2) the trial court abused its discretion in denying his motion for new trial based on the discovery of new evidence related to his mental disorder; (3) the court made an erroneous evidentiary ruling related to prior acts of violence by Mr. Davis which prejudiced his self-defense theory; and (4) the court erred in denying his postverdict motion for juror information.[1] We find no merit to defendant's contentions and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by information with one count of first degree murder (Pen. Code, § 187, subd. (a); count 1)[2], and one count of assault with a firearm (§ 245, subd. (a)(2); count 2). It was also specially alleged as to count 1 that defendant personally and intentionally discharged and used a firearm causing great bodily injury and death to Mr. Davis, and, as to count 2, that defendant personally used a firearm in the assault on Mrs. Davis. (§ 12022.53, § 12022.5.) Defendant pled not guilty and denied the special allegations. The case proceeded to a jury trial in October 2012.

### A. Pretrial Rulings on Admissibility of Propensity Evidence

During the hearing on pretrial motions, defense counsel argued "this is a self-defense case" and that "it is absolutely clear in this case that we are offering evidence of

---

[1] Defendant has also filed a petition for habeas corpus (case No. B253916) which we resolve by way of separate order.

[2] All further undesignated section references are to the Penal Code.

reputation in specific instances of conduct relative to the violent propensity on the part of the [*sic*] Mr. Davis, the victim in this case, particularly with respect to the 2008 incident . . . ." Defense counsel argued that incident, in which Mr. Davis was apparently charged with some sort of an assault on his wife and daughter, involved "aberrant" or "bizarre" behavior that qualified as prior violent conduct, irrespective of the fact that Mr. Davis had undergone "serious brain surgery" several months before. Defendant also argued two additional incidents were relevant to show Mr. Davis's propensity for violence: (1) an incident in 2009 in which Mr. Davis allegedly "peep[ed]" into the home of a family member; and (2) an April 2011 incident in which he sprayed water and threw clods of dirt over his backyard fence at defendant.

In response, the prosecution stated it had no intention of offering "good character" evidence of the victim in its case-in-chief. The prosecution also conceded the alleged 2008 domestic violence incident and the 2011 water spraying incident were probably admissible as propensity evidence during the defense case, but that the 2009 alleged peeping incident did not show a propensity for violence and should be excluded as unfairly prejudicial. The prosecution asserted that if the court allowed the prior incidents regarding Mr. Davis, then the prosecution should be allowed, pursuant to Evidence Code section 1103, to rehabilitate during rebuttal with evidence of Mr. Davis's good character, and also to offer evidence of defendant's violent propensities.

The court ruled defendant would be allowed to offer the 2008 domestic violence incident and the April 2011 water spraying incident as prior violent acts by Mr. Davis. But, the court excluded the 2009 alleged peeping incident under Evidence Code section 352, noting that defense counsel could revisit the issue with a better offer of proof. The court cautioned defense counsel that if defendant presented the propensity evidence, then the prosecution would be allowed, pursuant to section 1103, subdivision (b), to offer evidence of prior violent acts by defendant and could also introduce evidence of Mr. Davis's good character. During his opening statement, defense counsel outlined the defense's theory of self-defense as justification for the shooting of

3

Mr. Davis, and indicated that evidence would be presented regarding Mr. Davis's propensity for violent and erratic behavior.

Later, before the start of the defense case, defense counsel advised he no longer intended to offer any propensity evidence regarding Mr. Davis. "On reflecting in this case, . . . I decided this morning that I do not want to open the area of bad character or good character of the defendant or of the victim in this case. So for various tactical and strategical [*sic*] reasons I've decided that I'm not going to pursue the issue of the arrest of Mr. Davis when he allegedly attacked his wife and daughter in 2007. . . . Not put on the evidence, specific instances of violent conduct of the victim."

## B.    Trial Testimony[3]

The prosecution presented its case-in-chief. Mrs. Davis testified that in the fall of 2011, she, her husband, and her nephew (Joshua Clinton) were living at their home on Calypso Lane in Canyon Country. The Davis house was the last home at the end of the street, which ended in a cul-de-sac. Their next-door neighbors, directly to the south of their home, were defendant and his wife, Sandra Tracey.

The relationship between the Traceys and the Davises was acrimonious. Mrs. Davis candidly stated they did not like the Traceys because they "harassed" them, including repeatedly calling city officials to complain about them, posting rude signs about her and Mr. Davis, shining lights to disrupt their security cameras, and similar conduct. She denied she or her husband ever retaliated against the Traceys for their behavior.

Mrs. Davis explained they also experienced acts of vandalism, such as damage to their cars, which she and her husband attributed to the Traceys. In early 2011, they installed eight exterior security cameras to monitor activity outside their home, particularly at night when the vandalism seemed to occur. She and Mr. Davis also obtained a restraining order against the Traceys. Mrs. Davis said the Traceys obtained a

---

[3]    Some of the trial testimony which was either cumulative or immaterial to our discussion has been omitted.

restraining order against her and her husband as well. She was not aware of her husband ever taking pictures of the Traceys or their house as defendant claimed, but she did take pictures of the signs the Traceys put up in their yard, to document them.

On the evening of September 23, 2011, Mrs. Davis fell asleep while watching television on the couch in her living room. Sometime around 3:00 in the morning, she was awakened by light coming from the refrigerator in the kitchen. She saw her husband was up and looking for something to eat. Mrs. Davis heard her husband continue to roam around, turning off the television and the like. After a few minutes, Mr. Davis came over to the couch and told her he was going to go next door and tell the Traceys to turn off their lights.

Only a couple of minutes later, Mrs. Davis heard two loud gunshots, one right after the other. Mrs. Davis leapt up and ran outside and down toward the Tracey house. She saw her husband lying flat on his back on the walkway in front of the Tracey home. There was blood on the chest area of his shirt. As she went up to her husband, defendant opened his front door. She could see him very clearly. Defendant pointed a shotgun at Mrs. Davis and told her to "get the fuck away." Mrs. Davis ran back to her house to get a phone to call 911 and started to yell for her nephew. As she phoned 911, neighbors started to come out of their homes.

Nichole Soto lived a couple of doors down the street. She had medical training and came out to try to help. Mr. Davis was not responsive when she arrived. He was flat on his back, eyes closed and there was blood on the left chest area of his shirt. Ms. Soto knelt by his body and began CPR. She could hear the sound of a female voice and a male voice speaking behind the closed front door of the Tracey home. She presumed it was Mr. and Mrs. Tracey. Neither of them came outside. After the deputies arrived, Ms. Soto did see Mr. Tracey twice open his door and stick his head out and say, "I'm right here" and then close the door.

Joshua Clinton was awakened by his aunt's screams for help, and ran outside to see what happened. He ran up to his uncle, took his hand, and tried to talk to him, hoping to get some sign of life from him. He mostly stayed at his uncle's side while Ms. Soto

5

performed CPR. At some point, Joshua noticed there was a flashlight in Mr. Davis's hand. He placed it aside and eventually returned it to the Davis home.

Sergeant Brian Allen of the Los Angeles County Sheriff's Department responded to the scene pursuant to a radio dispatch call reporting an assault with a firearm on Calypso Lane. When he arrived, there were several people outside the Tracey home, some of whom were pointing and yelling that the gunman was inside the house, and others who were clustered around a victim on the walkway. A woman was performing CPR. He described it as a "confusing" and "somewhat chaotic" situation. Sergeant Allen positioned himself near the front door.

Defendant opened the front door about a foot and stuck his head out. Sergeant Allen ordered him to show his hands and step outside. Defendant refused to come out, but yelled "almost angrily" for Sergeant Allen to come inside, and then closed the front door. Concerned the situation could get worse, Sergeant Allen ordered Deputy Duxbury, who was with the victim, to move the victim away from the view, and potential line of fire, of the front door. Numerous other deputies began to arrive and Sergeant Allen ordered them to locations around the home to contain the perimeter.

Defendant then opened the door a second time. Sergeant Allen repeated the same commands to defendant, but he again refused to come out. Defendant again yelled at Sergeant Allen to come inside. Sergeant Allen described defendant's tone as one of "anger and annoyance." Sergeant Allen testified that, with his gun drawn, he began to move toward defendant still standing inside the doorway of the house. Defendant backed further into his house but did not close the door this time, so Sergeant Allen proceeded into the home, issuing commands for defendant to lie face down on the ground and put his hands on the top of his head.

Sergeant Allen said he had to repeat his orders numerous times because defendant refused to comply. Defendant "continuously argued" with Sergeant Allen and yelled at him to close the front door. Mrs. Tracey, who was seated at the kitchen table, also yelled for the front door to be closed so the cats would not get out. Sergeant Allen told defendant that if he did not comply, deadly force might be used against him. Defendant

6

finally complied. With the assistance of several other deputies, defendant and his wife were handcuffed, placed at the kitchen table, and the rest of the house was cleared for any other threats. A shotgun was found lying on the couch.

Deputy Scott Burke testified he assisted in the arrest of defendant at his home. While several other deputies ensured there were no other individuals inside the Tracey home, Deputy Burke stood near defendant where he was seated, in handcuffs, at the kitchen table. Both defendant and his wife seemed preoccupied with making sure no one let out any of their cats. Defendant seemed reasonably "calm," but Mrs. Tracey seemed a little more "agitated."

While seated at the kitchen table, defendant asked for his handcuffs to be loosened. As Deputy Burke leaned in to loosen the handcuffs, defendant said "this is the first time I've had to discharge a weapon in anger, and I was in the Army." Deputy Burke described defendant's tone as "calm, almost reflective."

Deputy Blake Carpenter was also inside the house at this time and heard defendant utter these words in a "very calm tone," almost like he was "talking to himself or under his breath." Deputy Carpenter testified he remembered the words precisely because he recorded them almost immediately in his notebook, and then used his notebook when preparing his incident report.

Several tapes from the video surveillance cameras outside the Tracey and Davis homes were played for the jury. Detective Brandt House, one of the lead detectives handling the case, testified about the nature of the surveillance systems and some of the video recovered that captured images from the night of the incident. One video, taken from near the Traceys' front porch, showed Mr. Davis approaching the house, then walking out of view as he got closer to the front door. Detective House opined that the two bursts of dust that appeared in the video, the first within a few seconds of the second, were the clouds of gunshot residue expelled from the shotgun when it was fired. The video then showed Mr. Davis falling backward onto the walkway.

Both Detective House and Sergeant Allen attested to the evidence recovered at the scene, including shotgun shell casings and blood from the walkway area in front of the Tracey home. No blood or expended shells were found inside the Tracey home.

Detective House also testified concerning various photographs of the crime scene, as well as photographs of the signs made by defendant and hung up in his yard facing the Davis home, including: a picture of a one-eyed deformed being with the title, "Tony the Two Ton Tard. Starring In The Fatass Stinking Blob That Crawled From The Swamp"; another with the deformed being standing with a boy containing the titles, "Calypso Cove Proudly Presents Brokeback Buddies Featuring Two Ton Tony 'The Pitcher' & Boytoy 'The Catcher,' A Tale of 2 lovers . . . a pool . . . a pizza, a jar of lube . . . and the stars in each others eyes!!"; another containing the words, "Coming Soon Whales of Summer. Viewing Platform & Picnic Area. Please . . . NO Flash Photos It Scares The Whales! And They Throw Dirt, Small Pieces of Metal, And Spray Water. DVD's Posters Keychains At The Gift Shop. Thank You and Enjoy the Show!"; another read "YOU STINKIN' PEDOPHILE FAT BASTARD"; a picture of a pig with the title "Coming Soon. Cyndie Pew's Thow' Down at the Hoe Down Buffet and Peting Zoo"; and another with a walrus with the title "Cindisoreass Walrus 2 Shows Daily."

Two calls to 911 made by Mrs. Tracey (one at 2:58 a.m. and one at 3:05 a.m.) were played for the jury.

Dr. Ogbonna Chinwah, a medical examiner with the County of Los Angeles, testified Mr. Davis suffered a gunshot wound to his chest that was "absolutely fatal." He described it as a two and a quarter inch irregular-shaped entry wound in his left chest; the projectile had entered the chest cavity "extensively lacerating the heart, the right lung, and . . . the right chest cavity" resulting in "very rapid death." Based on the nature of the wound, Dr. Chinwah opined the muzzle of the shotgun was approximately three feet from Mr. Davis when the shot was fired.

Dr. Chinwah also explained that Mr. Davis suffered another fatal wound in the back. The projectile entered the lower back, lacerating the kidney, the spleen and the vessels inside the abdomen. He explained the wound would have been independently

8

fatal had it been the only wound Mr. Davis suffered. He opined Mr. Davis was likely four feet away from the muzzle of the shotgun when he received the second wound. Dr. Chinwah could not determine which wound was suffered first.

Manuel Munoz, a senior criminalist and firearms examiner for the County of Los Angeles, testified. Based on testing performed on defendant's shotgun, Mr. Munoz confirmed the two shells fired into Mr. Davis, containing birdshot, came from defendant's 12-gauge shotgun. Additionally, Mr. Munoz determined, through testing, that the distance between the muzzle of defendant's gun and Mr. Davis was approximately two to four feet when the chest wound was inflicted, and between five and six feet for the wound in his back. Mr. Munoz explained that a measurement from the "muzzle" meant measuring from the tip or end of the barrel of the gun, and that the total length of defendant's gun was 38 and a quarter inches. The defense firearms expert, Patricia Fant, later testified she conducted the testing with Mr. Munoz and concurred in his opinion as to the muzzle-to-target distances for both wounds.

The defense case began with testimony from Sergeant Gean Okada of the Los Angeles County Sheriff's Department, who briefly testified and confirmed some of the various images shown on the surveillance videos.

Defendant testified in his own defense. He said he had been on disability since 2002 due to a workplace injury. He explained he and his wife had not gotten along well with Mr. and Mrs. Davis for a number of years, beginning with an incident in which the Davis's dog purportedly threatened the child of one of their friends. Defendant contended Mr. Davis shined lights into his home, took photographs of him, his wife and his house, and also vandalized his property and cars.

Defendant explained he had exterior lights and four surveillance cameras outside his home. He also had an infrared light posted on his fence to illuminate the side of his yard where most of the vandalism occurred—the side between his home and the Davis home. Defendant denied he ever positioned any flood light or the infrared light to point at or illuminate the Davis home or interfere with their security cameras.

9

Defendant confirmed he owned a shotgun. He explained he had purchased the shotgun, several years before the incident, to go skeet shooting with his stepson. He always kept the shotgun, loaded, but with the safety engaged, in a zippered bag in his bedroom.

Defendant said Mr. Davis would throw things at him and spray water from a hose at him from over the backyard fence when he was working in his yard. He believed Mr. Davis was always watching and photographing them, and he tried to report it to law enforcement but nothing was done. Defendant conceded that in 2011 he made various insulting signs depicting Mr. and Mrs. Davis, and hung them up in his yard. But he said he hung them where the Davises would only see them if they were watching and looking into his yard. He said it was "the only way I could think to communicate with him that watching us and photographing us was not normal behavior."

On the night of September 23, 2011, defendant went to sleep on the couch in his front room as he often did because he got up frequently during the night and did not want to disturb his wife. At some point in the early morning hours of September 24 (approximately 2:30 a.m.), defendant was awakened by some "banging" and other noises, including "mechanical-type" noises he could not immediately identify.[4] He also noticed some sort of flashing light coming in through the window. He thought it might be from a person or persons coming toward the house, pointing a flashlight at the door. Defendant turned on the recording device hooked up to his surveillance cameras, but did not turn on the monitors inside the house so he could see what was going on outside because he had been having trouble with the monitors. Defendant also yelled for his wife to call the police.

Defendant testified he believed there was a "prowler" and he was "terrified" for the safety of his wife, his cats and himself, which is the reason he told his wife to call the police. His wife was "absolutely hysterical." At one point, the light came very close to

---

**4**      One portion of the surveillance video played for the jury showed Mr. Davis apparently using an electric drill on his fence for a brief period of time.

the door and he heard a voice saying "[c]ome out, come out." He did not recognize the voice. Defendant explained he went to the bedroom to retrieve the gun because his wife said the police were not answering the phone. For a moment, defendant thought it might be the police because several months earlier they had made an unexpected appearance at their home late in the evening, and had shined flashlights into the house. However, defendant next thought it was probably a home invasion robbery, because no one comes over "to visit" at 3:00 in the morning.

Defendant brought the shotgun into the front room near the door and rested it against the wall. He said he yelled again for his wife to call 911 as he kept watch on the door. He said it all happened "so fast," he "didn't have a whole lot of time to think," and he was "terrified [it] was a home invasion." He decided to "crack the door open and make it clear that [he] was armed and if they weren't the police to leave the property." When he opened the door, "a flashlight came through the crack of the door in [his] face."

Defendant explained that, with the light shining in his eyes and blinding him, the door was pushed open with "great force." He was knocked backwards toward where the shotgun was resting against the wall. Defendant said he was so frightened he urinated in his pants, but he was able to pick up the shotgun. He could not identify who had pushed open the door. He only saw a "large mass" in the doorway. Defendant said he yelled that he was armed and that the person or persons should get on the ground.

Defendant said the person or persons kept moving toward him. From his position in the foyer, defendant said he shot in the direction of the "intruder." He said he thought he could still "detect" movement, so he "immediately cycled the weapon and stepped toward the door" because he thought the intruder was reaching for something. The flashlight had apparently been dropped as it was now "pitch black." From the threshold area of the front door, defendant fired a second shot. Defendant believed the person ended up lying on his or her back on the porch, so he ran out to turn on the lights on the front of the garage for "first responders" and then ran back to the front door, picked up the shotgun and went inside. He placed the shotgun on the couch. Defendant said he believed his wife was on the phone with 911 when he came back inside.

11

Defendant denied knowing or even suspecting the person was Mr. Davis because, to his knowledge, Mr. Davis had "never" come onto their property before. Sometime while his wife was talking to 911, defendant turned on the porch light and looked outside and realized the person lying outside on the walkway was Mr. Davis. Defendant saw Mrs. Davis approach. He denied pointing the gun at her and telling her to "get the fuck away." He said he did not have the gun in his hands, and told her only to "stay off the property" and that 911 had been called.

When several neighbors started to show up and attempt to give aid to Mr. Davis, defendant said they were yelling and screaming what sounded like threats. He did not want to risk any of them attacking him or his wife, so he stayed inside to wait for the police to arrive. Defendant denied he said, in front of Deputies Burke and Carpenter, "this is the first time I've had to discharge a weapon in anger, and I was in the Army." He contended he told them "I have never had to fire a weapon in anger even . . . in the Army."

Mrs. Tracey also testified. She admitted she and her husband did not like the Davises. She believed Mr. Davis vandalized their property and intentionally pointed flood lights into their yard at all hours of the day and night. She called him the "neighbor from hell." Mrs. Tracey explained that the signs her husband made that were derogatory of the Davises were hung in their own backyard and, in her opinion, they were not visible to the Davises unless they were specifically looking into the Tracey yard.

In September 2011, Mrs. Tracey said defendant was angry with the Davis family, as well as the sheriff's department for failing, in his opinion, to do enough to stop the Davises' behavior.

Mrs. Tracey explained she was not sleeping well on the night of September 23. Sometime between 2:30 and 3:00 in the morning of September 24, Mrs. Tracey got up to go to the bathroom. Defendant was also awake and told her he was hearing noises and she should call the police. Defendant told her he thought a prowler was outside their home. Mrs. Tracey initially called the regular office number for the sheriff's department and did not get a response and she told defendant she was not getting through.

12

Mrs. Tracey then noticed there appeared to be lights flashing outside the front door. She and defendant thought there might have been more than one person outside. Mrs. Tracey heard the "most frightening sound that I ever heard coming at my home. There was just an unbelievable pounding sound, like either someone just was pounding like crazy at the door or something was thrown at our door." She was frightened and thought someone was trying to get into the house to harm them. The noise was so loud she thought someone might have thrown a tire at the front door, as they had several tires stacked up out front that they were trying to sell.

Mrs. Tracey did not see the shooting. Defendant told her to go back into the bedroom for her safety, so she only heard the sound of the two gunshots shortly thereafter.

Mrs. Tracey testified she then called 911 twice, over the course of several minutes. In the first call, she admitted she told the operator there had been a prowler on the property and her husband had shot him. Defendant could be heard making the same statement in the background. She told the operator they needed to get "a cop here immediately." When asked about the portion of the call in which she said "[y]ou stupid fool. What the hell are you doing?", Mrs. Tracey said she had directed that comment to the 911 operator, not her husband, because the operator acted like she did not even know how to spell Calypso Lane or where the street was located. She said she was hysterical because of what had just happened, and frustrated by the 911 operator's responses. She also conceded she said, "[p]ut the cats away. Jesus fucking Christ, I don't believe you did that." She again explained she was upset and screaming because of what had happened.

Mrs. Tracey testified she never had any suspicion it was Mr. Davis, because to her knowledge, he had never been on their property before.

During the second 911 call, Mrs. Tracey admitted she told the operator that defendant had shot their neighbor, who had been charging the house, because by that time, she had looked out the window and realized it was Mr. Davis lying on the ground. Mrs. Tracey also explained they had seven cats, all of which were rescues which had

13

never been outside, and so she and defendant were extremely concerned about them getting outside in all the commotion which is why they kept asking the deputies to close the front door.

The jury found defendant guilty on both counts and found the special firearm allegations true.

## C.     Posttrial Proceedings

After the verdict was recorded, defendant substituted in new privately retained counsel.   Through his new counsel, defendant requested and was granted time to present a motion for new trial and a petition seeking juror contact information.  Defendant thereafter filed both motions.  The request for juror contact information was based on alleged juror misconduct arising from incidents involving the excusal of two jurors.  The court denied defendant's petition.  We reserve a more detailed recitation of the facts related to defendant's petition to part 4 of the Discussion below.

Defendant's motion for a new trial was based primarily on the grounds that new psychiatric evidence had been discovered, postverdict, from defendant's worker's compensation case file, and that such evidence was material to the issue of mitigating the requisite mental state for first degree murder.  Defendant also raised a secondary argument related to the alleged discovery of a photograph depicting blood evidence on the front door of the Tracey house, but that issue has not been raised in this appeal and we therefore do not address it.  Following opposition briefing by the prosecution and oral argument, the trial court denied defendant's motion and proceeded to sentencing.

The court sentenced defendant to a state prison term of 64 years to life, calculated as follows:  25 years to life on count 1, the base count, plus a consecutive 25-year term for the firearm enhancement pursuant to section 12022.53, subdivision (d); and a consecutive four-year upper term on count 2, plus a 10-year term for the firearm enhancement pursuant to section 12022.5.  The court also imposed and stayed, pursuant to section 654, a 20-year term and a 10-year term on count 1 for the firearm enhancements pursuant to subdivisions (b) and (c) of section 12022.53.  Defendant was

awarded 593 days of custody credits, and was ordered to pay various fines, fees and restitution.

This appeal followed.

## DISCUSSION

**1.     There is Substantial Evidence of Premeditation and Deliberation**

Defendant contends the record does not contain substantial evidence of premeditation and deliberation and therefore, his conviction for first degree murder must be reversed.  "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*Ibid*.)  "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; accord, *People v. Manriquez* (2005) 37 Cal.4th 547, 577 (*Manriquez*).)  We conclude the record contains ample evidence supporting the jury's first degree murder finding.

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, the Supreme Court "identified three types of evidence—evidence of planning activity, preexisting motive, and manner of killing—that assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 (*Mendoza*).)  However, the court made clear "that ' "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." [Citations.]' " (*Ibid.*; accord, *People v. Perez* (1992) 2 Cal.4th 1117, 1125, and *Manriquez, supra*, 37 Cal.4th at p. 577 ["*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse."].)

15

Defendant concedes the evidence established that Mr. Davis's death was the result of defendant shooting him, and that there are credibility issues raised by defendant's testimony the shooting was justifiable self-defense. Defendant argues the evidence nonetheless unequivocally shows the events on the night of the shooting unfolded rapidly, without any time or circumstances supporting a finding that defendant reflected, deliberated or made any planned, intentional choice to kill Mr. Davis. We disagree.

The relatively short timeframe in which the crucial events occurred is not dispositive. The Supreme Court has repeatedly emphasized that " '[t]he process of premeditation and deliberation does not require any extended period of time.' " (*Manriquez, supra*, 37 Cal.4th at p. 577.) " ' " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. *'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'* " ' [Citation.]" [Citations.]' [Citation.]" (*Mendoza, supra*, 52 Cal.4th at p. 1069, italics added; accord, *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1427-1428, and *People v. Brito* (1991) 232 Cal.App.3d 316, 323-324 [fact that the defendant made decision, within a matter of a few seconds, to shoot fleeing victim in back did not defeat finding of deliberation].)

The fact defendant had the time to make the decision to retrieve his shotgun from the bedroom, ensure it was loaded and place it within reach of the front door, while he formed a plan on how to proceed, is more than sufficient to establish adequate time for the requisite level of reflection. It also supports the inference defendant considered the possibility of violence, including homicide, before confronting the person outside his home. (*People v. Lee* (2011) 51 Cal.4th 620, 636 [fact that the defendant "brought a loaded handgun with him . . . indicat[ed] he had considered the possibility of a violent encounter"]; *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [evidence that the defendant took a knife into the victim's home raises reasonable inference " 'he considered the possibility of homicide from the outset' "].)

While defendant claimed to have acted in self-defense, he testified unequivocally that he chose to open his front door to confront the person outside, instead of staying

16

inside behind the protection of his locked front door. The blood evidence and ejected shotgun shells were all located outside the residence consistent with defendant having gone outside to confront Mr. Davis, not inside the foyer where they were more likely to have been found if Mr. Davis had forced his way in through the front door as defendant testified.

The testimony of the medical examiner and the firearms experts established that Mr. Davis was shot twice at close range, both in vital areas of his body, and that one of the wounds entered through his back, raising the inference he was trying to retreat when he was shot in the back. (*People v. Paton* (1967) 255 Cal.App.2d 347, 351-352 [factors such as use of a knife and wounds that do not appear without aim but directed toward chest and heart relevant to finding of requisite premeditation]; *Manriquez*, *supra*, 37 Cal.4th at pp. 578-579 [evidence that the defendant armed himself with a concealed weapon, confronted the victim, and fired several shots into his chest was "plainly sufficient" to support first degree murder].)

Defendant's demeanor following the shooting was also relevant. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082 [manner of killing in which the defendant fired a shot, at close range, at a vital area of the victim's body, and then prevented a witness from calling an ambulance was indicative of a deliberate intention to kill].) Defendant, upon discovering the person he shot was Mr. Davis, did not go outside and attempt to render aid. Rather than letting Mrs. Davis try to assist her husband, who was lying prostrate on the walkway in front of his home, defendant threatened her with his shotgun and ordered her off of his property. Three different deputy sheriffs testified that defendant's demeanor following the shooting was calm, not fearful, remorseful or upset. Sergeant Allen even described defendant as acting almost "annoyed" and more concerned with his cats getting outside than with the fact he had just shot his neighbor. Both Deputy Burke and Deputy Carpenter testified defendant described the shooting as the "first time I've had to discharge a weapon in anger, and I was in the Army."

There was significant evidence in the record supporting motive and ill will toward Mr. Davis, including a long-term acrimonious relationship, and testimony from

17

defendant's wife that in September 2011, defendant was angry and frustrated both with Mr. Davis and the sheriff's department which he believed had not done enough to assist him in dealing with the problems with the Davises.

The record is replete with evidence supporting the jury's determination that the shooting of Mr. Davis was the product of premeditation and deliberation. There is no basis for reversing the jury's first degree murder finding.

2.      **The Trial Court Did Not Abuse its Discretion in Denying Defendant's Motion for New Trial**

Defendant contends the trial court erred in denying his motion for new trial. Defendant argues that new psychiatric evidence from his worker's compensation case file, discovered postverdict, warranted the ordering of a new trial, and that the court abused its discretion in denying the motion. We are not persuaded.

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' [Citation.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328; accord, *People v. Howard* (2010) 51 Cal.4th 15, 42-43 (*Howard*).) The record here supports the court's exercise of discretion in denying defendant's motion.

Defendant claimed his new counsel (Mr. Zinnanti) discovered, after the verdict, records contained in his worker's compensation file reflecting the fact he had been diagnosed with a mental disorder. Specifically, defendant argued he underwent a psychiatric examination as part of his then-pending worker's compensation claim, and approximately one month *before* the shooting, a report issued in which he was diagnosed as suffering from "bipolar disorder-manic phase, acute (industrially related)." (Capitalization omitted.) The report was provided to his worker's compensation attorney, Mr. Pearman. Defendant argued he was unaware of this diagnosis and that his trial

18

attorneys failed to discover it.[5]  There is no dispute the report was in the possession of Mr. Pearman, but it contained an admonition that the report should not be given to "the claimant."  Trial counsel (Mr. Mandel) attested in a declaration he was aware defendant had a pending worker's compensation claim but was unaware of the diagnosis until after the verdict was rendered.

Defendant's newly retained counsel (Mr. Zinnanti) submitted a declaration attesting to having obtained the report by talking to Mr. Pearman following his retention in the case.  Mr. Zinnanti also stated he consulted with a neuropsychologist (Dr. Hope Goldberg) who diagnosed defendant as suffering from a "[d]elusional disorder, [p]ersecutory type," and had opined that defendant's shooting of Mr. Davis occurred "spontaneously" as a product of his persecutory delusions.  Defendant argued that a new trial was therefore warranted because the evidence of his mental disorder was material evidence directly relevant to the jury's determination of his capacity for premeditation and deliberation at the time of the shooting.

Where, as here, a motion for new trial is made on the grounds of newly discovered evidence, the trial court evaluates the following factors:  " ' " ' 1.  That the evidence, and not merely its materiality, be newly discovered; 2.  That the evidence be not cumulative merely; 3.  That it be such as to render a different result probable on a retrial of the cause; 4.  That the party could not with reasonable diligence have discovered and produced it at the trial; and 5.  That these facts be shown by the best evidence of which the case admits.' "  [Citations.]'  [Citation.]  'In addition, "the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable." [Citation.]'  [Citation.]" (*Howard*, *supra*, 51 Cal.4th at p. 43.)

We agree with the trial court that the proffered evidence was *not* newly discovered.  Newly discovered evidence, within the meaning of section 1181, only

---

**5**     Defendant was represented at trial by two attorneys, Mr. Loren Mandel and Mr. Jeffrey Vallens.

19

warrants the granting of a new trial where the new evidence is "material" to the defendant's case and it "could not, with reasonable diligence, have [been] discovered and produced at the trial." (§ 1181, subd. 8.) Defendant has not established either statutory requirement.

There is no dispute in the record that the report was in the possession of defendant's worker's compensation attorney, Mr. Pearman, before the shooting, and therefore well in advance of the October 2012 trial. Defendant does not purport to claim he was unaware he had been examined by a psychologist in connection with his worker's compensation claim, nor does he provide any evidence that he did not reasonably suspect a report of that examination had been prepared. Defendant offers no explanation for why he failed to disclose to his criminal defense attorneys that he had recently undergone a psychological examination in connection with his worker's compensation action. At trial, defendant presented portions of transcripts of his recorded conversations with his wife while he was in jail which showed that both defendant, and in his wife, remained in contact with Mr. Pearman, and were in fact having discussions with him about the possible settlement of defendant's claim. Defendant fails to explain why and how it was impossible to make a simple inquiry to Mr. Pearman about the possibility of any relevant information from his worker's compensation case file being shared with his criminal defense attorneys.

Defendant's motion was instead based solely on brief declarations (each less than one page) from Mr. Zinnanti and Mr. Mandel, stating that the mental disorder diagnosis was unknown until after the verdict. The motion wholly failed to establish that the information could not have been discovered and timely presented at trial with the exercise of reasonable diligence. "[O]ne who relies upon the ground of newly discovered evidence to sustain his motion for a new trial 'must have made reasonable effort to produce all his evidence at the trial, and . . . he will not be allowed a new trial for the purpose of introducing evidence known to him and obtainable at the time of trial, or which would have been known to him had he simply exercised reasonable effort to present his defense.' [Citations.]" (*People v. Williams* (1962) 57 Cal.2d 263, 273

20

[finding that the testimony of a witness known to the defendant prior to trial, but whose identity was not shared with defense counsel because defendant did not believe the witness would testify on his behalf, did not constitute newly discovered evidence].)

Defendant also failed to show that such evidence was material to his defense and likely to result in a different outcome. The proposed expert testimony of Dr. Goldberg contained largely inadmissible opinion evidence. In particular, Dr. Goldberg offered her opinion that the shooting of Mr. Davis occurred "spontaneously" as a result of defendant's persecutory delusions—an improper conclusion as to the ultimate fact of whether defendant formed the requisite mental state for first degree murder when he shot Mr. Davis. The trial court was not wrong to conclude that such testimony, as presented in defendant's motion, would not have been admissible at trial pursuant to sections 28 and 29. (*People v. Cortes* (2011) 192 Cal.App.4th 873, 908 ["[S]ections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged."].)

Defendant argues Dr. Goldberg could have offered proper opinion testimony in a new trial based on hypotheticals grounded in the facts of the case. Even assuming Dr. Goldberg could have offered different opinions than those presented in her declaration in support of the motion for new trial, her testimony would have remained largely irrelevant to defendant's self-defense theory. Defendant testified *unequivocally* that he thought the person on his front porch was an unknown prowler or prowlers, not Mr. Davis. He expressed being fearful that the prowler intended to commit a home invasion robbery, but not that he was angry, or felt out of control. Defendant's entire description of the events that transpired that evening revolved around the central theme that he acted in rational, justifiable self-defense. Dr. Goldberg's opinions were not only inconsistent with defendant's self-defense testimony, but given the substantial evidence

21

in the record supporting first degree murder, they were not reasonably likely to result in a more favorable outcome to defendant in a new trial.

The trial court was well within its discretion in finding that defendant's motion did not satisfy the requirements of section 1181, subdivision 8. Accordingly, defendant has not established an abuse of discretion as to the denial of his motion for a new trial based on the discovery of purportedly new evidence.

**3.     The Evidence Regarding Mr. Davis's Prior Acts of Violence**

Defendant argues the trial court erred in ruling on the admissibility of evidence related to the prior acts of violence by the victim, Mr. Davis. Defendant contends the court erroneously determined the prior acts evidence was character or propensity evidence subject to the provisions of Evidence Code section 1103, subdivision (b),[6] which in turn deprived defendant of the ability to put on material evidence in support of his theory of self-defense. Specifically, defendant contends the evidence of Mr. Davis's prior behavior was *not* character evidence at all, but conduct resulting from a medical condition and brain surgery Mr. Davis underwent in 2008. Defendant argues that had the court not improperly invoked section 1003, then defendant would not have had to make the decision to forego presenting the prior acts evidence in order to avoid application of the statute which allowed the prosecution to rebut with evidence of prior violent acts by defendant. Respondent contends defendant forfeited any such argument by failing to raise the argument in the trial court, and that the argument lacks substantive merit as well.

We conclude defendant failed to preserve this argument for appeal. (Evid. Code, §§ 353, 354; *People v. Partida* (2005) 37 Cal.4th 428, 434.) At no point in the numerous

---

**6**     Evidence Code section 1103, subdivision (b) provides: "In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)."

22

discussions between the court and counsel about the prior acts evidence did defense counsel ever argue that section 1103 did not apply, or that the evidence was not character evidence. Indeed, defense counsel repeatedly characterized the prior acts evidence as "character" or "reputation" evidence, and never suggested that it should be considered otherwise because the potential genesis of such conduct was due to a medical condition. In arguing the prior acts evidence was admissible, defense counsel specifically mentioned Mr. Davis having had "serious brain surgery" but that it did not "detract" from the fact he exhibited "aberrant" and "bizarre" behavior which was properly admitted as evidence of a violent propensity. Defendant did not claim Mr. Davis's medical condition somehow transformed the prior acts evidence into something other than character evidence. Defendant therefore may not argue this contention for the first time on appeal.

In any event, even if the argument was not forfeited, it is without merit. We review the court's rulings as to the proffered evidence under the deferential abuse of discretion standard. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.)

First of all, the court ruled largely *in favor of defendant*, ordering that two of the three acts of violence by Mr. Davis were *admissible*. Nevertheless, defendant contends the court's ruling effectively forced him to forego presenting that evidence because of the court's determination it was character evidence. The court ruled that, pursuant to Evidence Code section 1103, subdivision (b), once defendant presented the prior acts evidence, it opened the door to the prosecution presenting rebuttal evidence that defendant also had exhibited a violent propensity.

Defendant argues the court's characterization of the prior acts evidence amounted to error. In support of his argument that Evidence Code section 1103 is not applicable, defendant relies principally on *People v. Myers* (2007) 148 Cal.App.4th 546. But *Myers* is of no assistance to defendant. *Myers* merely explained that "character evidence is premised on a continuity of character *over time*: ' "Character at an earlier or later *time* than that of the deed in question is relevant only on the assumption that it was substantially unchanged in the meantime, i.e. the offer is really of *character at one period to prove character at another*. . . ." ' [Citation.]" (*Id*. at p. 553.) *Myers* therefore

23

concluded that evidence of conduct of the defendant or victim occurring *at the time of the charged offense* is not properly characterized as "character" or propensity evidence. (*Ibid*.) Nothing in *Myers* can be read as supporting defendant's argument that if an individual's violent behavior is triggered by medical or neurological reasons then evidence of such prior violent acts is not properly deemed character evidence subject to section 1103.

No matter how defendant might try to recast the prior acts evidence, defendant was plainly offering the three prior incidents as evidence showing the propensity of Mr. Davis to act violently or erratically, such that it was reasonable to assume he may have acted violently on the evening of his death, thus providing justification for defendant's actions. Simply because Mr. Davis's prior conduct may have resulted from a medical condition does not change the nature of the evidence and the purpose for which it was being offered by defendant. The trial court correctly ruled the evidence regarding Mr. Davis's prior conduct was character or propensity evidence, and made appropriate rulings pursuant to Evidence Code section 1103. That defendant then made the tactical decision during trial *not* to offer the prior acts evidence so as to not open the door to the prosecution being able to offer rebuttal evidence does not transform the court's ruling into evidentiary error.

### 4.     Defendant's Request for Postverdict Contact with Jurors

Finally, defendant argues the trial court abused its discretion in denying his postverdict petition for contact with the jurors to establish possible juror misconduct. We review the trial court's ruling on defendant's petition under the abuse of discretion standard. (*People v. Avila* (2006) 38 Cal.4th 491, 604; *People v. Carrasco* (2008) 163 Cal.App.4th 978, 991 (*Carrasco*).) We conclude defendant has not shown any abuse of discretion in the court's ruling denying his petition.

By statute, juror identification information in a criminal case is sealed following the rendering of the verdict, and shall not be released except upon an order of the court following compliance with the statutory procedures for release of such information. (Code Civ. Proc., § 237, subd. (a)(2).) The statutory scheme was enacted, in its current

24

form, to balance the competing public policy interests of safeguarding juror privacy and ensuring the ascertainment of truth in judicial proceedings. (See *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096 ["In amending section 237 in 1995, the Legislature declared: 'The Legislature finds and declares that jurors who have served on a criminal case to its conclusion have dutifully completed their civic duty. It is the intent of the Legislature in enacting this act to balance the interests of providing access to records of juror identifying information for a particular, identifiable purpose against the interests in protecting the jurors' privacy, safety, and well-being, as well as the interest in maintaining public confidence and willingness to participate in the jury system.' "].)

Code of Civil Procedure, section 206, subdivision (g) provides: "Pursuant to Section 237, a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose. This information consists of jurors' names, addresses, and telephone numbers. *The court shall consider all requests for personal juror identifying information pursuant to Section 237.*" (Italics added.) Subdivision (b) of section 237 provides, in relevant part, that: "Any person may petition the court for access to these records. The petition shall be *supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.*" (Italics added.)

Defendant argues his petition established good cause based on the fact that two jurors were excused and replaced by alternates during the course of the trial. The motion did *not* contain a declaration detailing good cause, but rather, relied on the excerpts of the transcripts of the proceedings regarding the excusal of the two jurors, the facts of which may be summarized as follows.

First, several days into the prosecution's case-in-chief, Juror No. 8 gave a note to the bailiff expressing a concern about the conduct of another juror. The court called Juror No. 8 into court for a discussion outside the presence of the other jurors. When queried, Juror No. 8 explained that Juror No. 10 had said, in front of other jurors, that his

25

wife had looked up the case on the internet, that Juror No. 8 had told him to "shut up" and not discuss the case, and Juror No. 10 responded by saying he just wished "they would get to the good stuff."

The court then spoke with Juror No. 10. He admitted he had said his wife had looked up the case, but he otherwise denied talking about the case in any way with other jurors and he denied making the "good stuff" comment.

After conferring with counsel, the court called in each remaining juror individually, including the three alternates, so that each of them could be asked whether any juror had discussed the case with them or whether any juror had indicated he or she had had discussions about the case with family members. All of the jurors responded no, except for Jurors No. 5 and 12.

Juror No. 5 reported Juror No. 10 had said his wife looked up the case on the internet and she told him they were not supposed to talk about the case with anyone. Juror No. 12 said Juror No. 10 had made comments out loud and in the presence of other jurors that the case was getting "tedious."

The parties stipulated that Juror No. 10 should be excused. Alternate Juror No. 1 was randomly selected to replace Juror No. 10.

Later, during the defense case, the alternate who had become Juror No. 10 raised concerns with the bailiff during a break in the proceedings. The court called Juror No. 10 into court for a discussion outside the presence of the other jurors. When asked what was bothering her, she replied: "Several things. I think that, you know, from the very beginning of this when I knew it was a case that was a local case, meaning in Santa Clarita, which is where I'm from, made me already nervous. And every day leaving the courthouse I've been feeling like people are following me and I've been kind of going home in different ways and what not." She continued by expressing concern about her anonymity as a juror because at lunch during the breaks, the restaurant would call out her name when her order was ready and people in the restaurant could hear it, so she was now using different names at the restaurant.

Juror No. 10 went on: "But aside from that, that is what was going on last week. On Friday when I left the courthouse I went to a family event with my family, and a man approached me. I walked by. I was alone at the time. I wasn't with my family. And he said, San Fernando courthouse. So he recognized me. And I thought to myself here I am miles away from San Fernando courthouse and not in an area where there is other people, and all he said to me, or at least from what I remember because I'm sure I was completely surprised by it, was something to the effect he was a juror and he recognized me and he talked about how he got out of jury. I think something about: Oh, I said something to them about, oh, he did it or something like that."

She then reiterated her concern that it was a "local" case receiving press attention in her neighborhood. She said she had been planning on mentioning her run-in with the man who had claimed to be a discharged juror, even though "nothing happened" and "we didn't discuss the case." But she became more upset when she saw Joshua Clinton, the Davises' nephew, in court to testify. "I completely froze up." She went on to say that he "fit the description" of the man that approached her, but she was "by no means saying that it was him. I have absolutely no idea." However, her fear had distracted her and she did not feel she listened to any of his testimony and she was having trouble "keep[ing] it together."

The court asked Juror No. 10 if her feelings had risen to the level where she did not feel she could concentrate and give both sides fair consideration. She responded she believed so.

The court and counsel conferred amongst themselves and decided that Juror No. 10 should be asked some further questions. The court asked Juror No. 10 additional questions trying to pin down whether she thought she could be fair and act as an impartial juror. Juror No. 10 said she was too anxious and could not concentrate. She reiterated that she was not saying she knew the person who spoke to her was Joshua Clinton, because the interaction was at night, at a Halloween party. She just thought that he looked somewhat similar. Juror No. 10 also denied feeling intimidated by anyone actually in court for either side. She stated however that she was feeling insecure about

27

being known in her community on a case that was receiving publicity and that she was just not feeling safe.

Defense counsel stated on the record that the defense was "willing to agree [Juror No. 10] can be excused." The prosecutor agreed. The court excused Juror No. 10. She was replaced by one of the two remaining alternates, chosen at random, and the case continued.

Based solely on these two incidents, defendant argues the record is "replete with the possibility of misconduct" and that it is reasonably probable there was improper juror conduct discussing and prejudging the case. Defendant contends the likelihood of juror misconduct constituted good cause. We do not agree.

The trial court was well within its discretion in denying defendant's motion. "As the California Supreme Court has explained, '[a] criminal defendant has neither a guaranty of posttrial access to jurors nor a right to question them about their guilt or penalty verdict.' [Citation.]" (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 382; *People v. Santos* (2007) 147 Cal.App.4th 965, 980.) Under the statutory scheme, a defendant must affirmatively show good cause for access to juror contact information. Defendant's motion was based on mere speculation about the possibility of misconduct by the deliberating jurors and did not set forth good cause for the release of juror information. Both defendant and the prosecutor participated in the court's handling of the two instances where jurors were excused during trial, and agreed to the removal of those two jurors. Alternates replaced the excused jurors, and trial proceeded and concluded without further incident. Nothing happened concerning either recusal that raises the specter of probable misconduct by the remaining jurors who deliberated and reached a verdict.

Defendant contends his request to have the court mail the letters providing counsel's contact information to the jurors (as opposed to seeking the jurors' contact information directly) would have reasonably safeguarded the privacy of the jurors and ensured that no juror would be contacted unless he or she chose to initiate contact with defense counsel in response to the letter from the court. The procedure suggested by

28

defendant was a reasonable and appropriate way to protect juror privacy, but it did not dispense with the statutory requirement to show good cause in the first instance. (*Carrasco*, *supra*, 163 Cal.App.4th at p. 991 [affirming denial of petition for release of juror information for lack of showing of statutory good cause].)

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.


We concur:

BIGELOW, P. J.



FLIER, J.