[Crim. No. 8499.   Second Dist., Div. One.   Feb. 6, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. ROGER DOM-
INICK PERROTTA, Defendant and Appellant.

William E. Buckner, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was convicted of first degree murder by a jury which fixed the penalty at life imprisonment. Motions for new trial, for reduction of the degree of the crime, and for probation were thereafter denied. The appeal is from the judgment. Defendant challenges the sufficiency of the evidence to support a verdict that the homicide was committed by any of the means designated in the applicable statute (Pen. Code, § 189) ; he also contends that the trial court committed prejudicial error in failing to instruct more fully with respect to the commission of murder in the perpetration of robbery.

The female victim, Vikki Raus, died in Los Angeles General Hospital on March 11, 1962, some 10 days after a beating inflicted in a Palmdale bar by defendant, her recently discarded paramour.[1] The autopsy determined that the cause of

---

[1]Shortly after removal to the local hospital, she told a friend: "Blackie [defendant's nickname] did this to me." At that time she said she was dying.

death was kidney failure (producing uremic poisoning) due to multiple and severe injury of the important abdominal organs: in the opinion of the autopsy doctor, the above injuries resulted from one or more severe blows. Also revealed in the autopsy report were a skull fracture and multiple contusions of the brain area; these injuries were likewise caused by a severe blow and contributed to the victim's death. Previously, and within a short time after the beating, the victim had been treated at the Antelope Valley Hospital. The examining doctor found it necessary to make certain surgical repairs. He testified that in his nine years of practice he had not seen injuries as severe as those he had found on the victim's person. In his opinion the injuries to the abdomen were caused by very heavy blows or kicks, apparently repeated. There were also lacerations (inflicted by a sharp instrument) on both sides of the arms and left leg, 2 or 3 inches in length and extending through the skin into the muscles. There was a head bruise, about 4 inches in diameter — a preliminary X-ray indicated a straight-line fracture. When the doctor first saw the victim, she complained of pain in her abdomen; in his opinion, such injuries would cause severe pain and warranted his patient's complaint in that regard.

About a week prior to the beating, Vikki terminated her illicit relationship with the defendant which had been entered into about nine months previously. She began living in the office at Hugo's Bar and Hugo's Palm Bowl (a bowling alley) in Palmdale. William Raus, to whom Vikki was married, managed both operations, and she had been employed there since 1959. On Sunday, February 25, defendant came to Hugo's Bar. He had been drinking. Both Vikki and Mr. Raus were present. Using abusive language, he threatened to kill both of them. He threw a "shot glass" at Vikki which she avoided by ducking. On another occasion, that same day and place, defendant told Vikki that if she got him out of there he would kill her — he had picked up a stool and started after Vikki. The following Wednesday (February 28), defendant was in the bar on four or five occasions. He again threatened to kill Raus. He repeatedly asked for Vikki's whereabouts.

On Thursday morning, March 1, defendant was in the bar about 8:30 or 9 o'clock. He asked Raus if he had a pill to prevent drinking. The latter told him to consult a doctor; he also told defendant that he was not wanted on the premises and that the police had been notified to that effect. As for

Vikki, Raus stated to defendant that "Vikki was going to leave town but she didn't necessarily want to be with me, she just wanted to get away from it all and she was so sorry the mess that she created." Within the next hour, defendant met a friend, one See, at a nearby bar. No liquor was consumed. They then proceeded to defendant's place of employment where he obtained his check (approximately $70) and then to a bank where the check was cashed. After some 30 minutes in a Lancaster bar, where each consumed three bottles of beer, defendant and See returned to Palmdale about 12 noon.

They entered Hugo's Bar where Vikki was then acting as bartender. Two men companions, who were with defendant and See from time to time that morning, left immediately. Within a minute or two after entering Hugo's, Vikki and the defendant began shouting at each other. During the argument, See heard defendant ask Vikki where she had been spending her nights. He then heard defendant tell Vikki that he was going to ruin her for any man, including Raus. As he spoke, he pointed to specific parts of Vikki's body. Defendant put his hand on Vikki and pushed her; the latter backed up. There was a trophy bowling pin on the end of the back bar. Just as See was going out the front door of the bar, he saw a "flash." He saw defendant pivot, his arm still in a throwing motion. See turned around and saw Vikki on the floor behind the bar — the trophy bowling pin lay beside her. Defendant then went out the side door of the bar and into the bowling alley portion of the establishment. During all of this time defendant gave no indication to See that he was drunk.

See returned to the bar with another man after about 20 minutes. Vikki was lying in the same place where he had last observed her. She had blood on her head and she was moaning. See telephoned the police — it was then about 1 p.m. Upon the arrival of the police, Vikki was placed in an ambulance. To the ambulance operator she appeared to be in pain; she would moan whenever he asked a question. A deputy sheriff, who arrived with the ambulance, noticed that Vikki's eyes were rolling back and she was gasping for breath. There was blood on her face, hands and arms. Blood was flowing from her head. The bowling pin was in the same general area where Vikki had been lying. When the deputy checked the cash register, there was only some loose change on hand.

Later that afternoon, defendant was seen in a parking lot

two blocks north of Hugo's Bar. He looked into one car, and then got into another. Finally he entered a car belonging to a barber working in a nearby barber shop. The barber left the shop, went to his car and opened the front door. Defendant said he "guessed" he was in the wrong car. His T-shirt and coat had blood spots on them. Defendant remarked that he thought he was in his wife's car; he then left. A deputy game warden who had been in the barber shop, intercepted the defendant. Though the deputy noticed the odor of alcohol on defendant's breath, the latter's speech was not slurred and he did not appear to be under the influence of alcohol.

Presently a deputy sheriff arrived. He likewise noticed an odor of alcohol on defendant's person although the officer did not consider that defendant was drunk. The deputy removed $98.75 from defendant's person, including two $20 bills, 23 singles, a $10 bill, three $5.00 bills and a roll of quarters. Upon being booked, there was blood on defendant's hands, T-shirt, jacket and hat. All these items, including the bowling pin and a bar knife, had human blood on them — the same type as Vikki's.

Defendant was first interrogated by Deputy Sheriff Edson about 6 p.m. that same evening. He said that he did not know what had happened to Vikki; that he liked her and would not injure her. He had no recollection of being at Hugo's Bar. He stated that he drank with a Whitey Middleton that morning, sharing two half pints of whiskey. Then he said that he remembered being in Hugo's Bar to see about some pills for drinking. Subsequently, defendant stated, he went with See, Middleton and one Ray to pick up his pay check. After it was cashed, beer and whiskey were consumed in Lancaster. He said he became involved in a brawl with Middleton, to which he attributed the blood on his clothing and hands. He remembered the incident in the parking lot; although he stated his belief that he was sitting in his wife's car, he acknowledged that his wife had no car. Defendant further stated that he left home with $39 in his pocket; he cashed his pay check for $61.95, thereafter he spent little money, and claimed that the money found on him was his.

The next day, March 2, Edson examined the person of Whitey Middleton. No marks, cuts or abrasions on his head, ears, hands or forearms were found. Nothing indicated any recent bleeding.

On the afternoon of March 5 defendant told Edson that he remembered being in Hugo's Bar; that he had an argument

with Vikki, that she struck him with one of the swinging doors; that he struck her with his fist and she went down. This was the last that he could remember.

On the morning of March 12, Edson told defendant that Vikki had died the previous morning. Defendant seemed upset; he repeated the statements of March 5. Asked why he had the argument with Vikki, defendant replied that ''he guessed he still loved her and he was hurt because they split up.''

Defendant took the stand in his own behalf. He admitted being in the bar on the Sunday before the beating but denied that he had threatened either Vikki or Raus. He stated that he saw Vikki the next day and the day after that; there was no animosity and they exchanged casual remarks. On the day of the fatal assault, according to defendant, he was in Hugo's; Vikki and he began arguing after they had first commenced a casual conversation. She spoke to him abusively, asking why he had gone back to his wife. He asked her why she had gone back to Raus. The argument became heated. Defendant told Vikki he was glad they had split up. She used an abusive epithet and swung the swinging door at him. He grabbed her with his hands to console her. He was kicked, and that was the last thing he remembered. Defendant testified that he did not remember throwing a bowling pin, kicking Vikki or using a knife; that he went to Hugo's with no intention of causing harm. Defendant, finally, had no recollection of going to the cash register and taking the money.

Although he had withdrawn a plea of not guilty by reason of insanity, defendant produced medical testimony that he was suffering from a mental disorder described as ''pathological alcoholic intoxication.'' This type of disorder, characterized by previous brain injury, makes an individual abnormally susceptible to a small amount of alcohol (2 ounces or even less) and triggers an episode of blackouts or unconsciousness. Rebuttal medical testimony was produced by the prosecution to the effect that defendant was not afflicted with the disorder described above. Additionally, it was the opinion of this rebuttal witness that defendant ''had the power of sight, he had the power of speech, he had the power to aim, he had anger, he had motive of jealousy and he wanted to disfigure this woman and all of these things were motivated by his jealousy and was responsible for these acts caused by an angry and drunken person.''

The jury was instructed that murder which is perpetrated

504

by any wilful, deliberate and premeditated killing, by means of torture, or in the perpetration of or attempt to perpetrate robbery is one in the first degree. As noted at the outset, defendant contends that the evidence is insufficient to establish that Vikki was killed by any of the above means.

A homicide committed during a sudden quarrel, while the perpetractor is in the throes of a violent rage, is not murder of the first degree. Dependent upon the facts deducible from the surrounding circumstances, including that of provocation, such a homicide may be murder of the second degree or it may be voluntary manslaughter. (*People* v. *Bender*, 27 Cal.2d 164, 179-180 [163 P.2d 8]; *People* v. *Thomas*, 25 Cal.2d 880, 901, 903 [156 P.2d 7].) It is argued by defendant that he and the deceased were in the process of breaking an emotional involvement of some nine months' duration; that each and every act involving the parties during the interval immediately prior to March 1st and on that day itself were colored with emotion; and that every fact adduced by the prosecution is consistent with the theory of a violent quarrel leading to a violent death.

But direct evidence of a direct and premeditated purpose to kill is not required in order to establish the crime of first degree murder. The necessary elements of premeditation and deliberation may be inferred from proof of such facts and circumstances as will furnish a reasonable foundation for such an inference; and where the evidence is not in law insufficient, the matter is exclusively within the jury's province. (*People* v. *Cole*, 47 Cal.2d 99, 106 [301 P.2d 854, 56 A.L.R.2d 1435].) Too, a murder is of the first degree regardless of how quickly the act of killing follows the ultimate formation of the intention if that intention has been reached with deliberation and premeditation. (*People* v. *Thomas, supra,* at p. 900.)

Applying the foregoing rules to the facts at bar, the evidence discloses previous quarrels of a tempestuous nature and previous threats against the decedent's life. Four days before the beating, defendant threatened to kill Vikki; immediately prior to the attack, he threatened to ruin her for any man. Whatever resolution the jury made of the conflict between defendant's and prosecution testimony, it could reasonably be concluded that defendant had developed a growing animosity toward Vikki because of her rejection of him, and that the last attack was the result of a deliberate and premeditated plan to take her life. The nature and extent of

the injuries inflicted, coupled with prior threats, also point to deliberation and premeditation. (*People* v. *Caldwell*, 43 Cal. 2d 864, 869 [279 P.2d 539].) The wounds suffered by the victim were numerous and severe; they therefore required more than a fleeting period of time to inflict. As stated earlier, the examining physician in his nine years of practice had not seen such severe injuries. In its totality, the evidence is sufficient to support a verdict that the killing was willful, deliberate and premeditated.

█ Even if the jury was not convinced that defendant had formed a deliberate and premeditated intent to kill Vikki, it could have concluded that the murder was of the first degree because it was committed by means of torture.

█ To constitute murder by torture there must be an intent that the victim suffer. Such intent may be motivated by revenge (*People* v. *Misquez*, 152 Cal.App.2d 471, 480 [313 P.2d 206]), and the existence of such intent can be established by the condition of the victim's body and the admissions of defendant. (*People* v. *Misquez, supra,* at p. 480.)

█ Contrary to defendant's claim that his actions were rash, impulsive and unconsidered, his conduct points unerringly to an intent to cause suffering for the purpose of revenge; it thus meets the legal requirements of "torture" enunciated in *People* v. *Tubby,* 34 Cal.2d 72, 76-77 [207 P.2d 51]. Just before the fatal assault, defendant threatened to ruin Vikki for any man; immediately prior to that statement, he had asked her where she had been spending her nights. The severity and number of the blows administered we have already mentioned; they lead inevitably to the conclusion that defendant intended to cause cruel pain and suffering upon a woman whose ardor for him had cooled.

As stated above, the jury was instructed that a killing in the perpetration of or attempt to perpetrate robbery is murder in the first degree. There was evidence that Hugo's Bar opened on the morning in question with a $50 "bank" for business purposes. It was composed of a roll of dimes, a roll of quarters and a roll of nickels; the remainder consisted of approximately $25 to $35 in small change plus enough singles to equal $50. When the bartender left the bar about 12:45 p.m., shortly before defendant's appearance on the premises, he had taken in about $17 and paid out about $4.00 to tradespeople. When Raus returned at 2:25 p.m., he found the bar closed. The register contained no rolls of coins nor bills. He determined that approximately $50 to $60 was miss-

ing. When arrested, defendant had money in certain denominations (for example, a roll of quarters) similar to those missing from the bar—he concedes that "the jury might reasonably have concluded [that] they were removed from the cash register." In view of this concession, and other incriminating evidence, we need not discuss at length the sufficiency of the proof to establish this third theory of the prosecution's case; it is enough, that the judgment appealed from can be sustained on the two theories already given attention.

Nevertheless the contention is made of which we shall dispose—that the trial court committed reversible error in failing to instruct the jury that a homicide is not committed in the perpetration of robbery if the intent to steal arises after the killing. He cites *People* v. *Carnine*, 41 Cal.2d 384, 388 [260 P.2d 16], in support of his claim. But in that case the defendant offered evidence tending to show that he did not intend to take any money until after the victim had been killed; in the present case, however, defendant testified that he had no intention of going to the register and taking any money. Too, and also unlike the situation in *Carnine*, defendant offered no instruction in elaboration of a general instruction deficient in particulars but otherwise correct. "The defendant will not be heard to complain where he has failed to request an amplification of an instruction in that form." (*People* v. *Reed*, 38 Cal.2d 423, 430 [240 P.2d 590].)

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.