VAN DYKE, J.
 
 *
 

 This is an appeal from a judgment of the Superior Court of Shasta County. Appellant was charged with murder. After a jury trial, she was found guilty of voluntary manslaughter. Probation was denied and she was sentenced to prison.
 

 Appellant was the common law wife of the deceased Robert “Rusty” Patón. The relations of the two for years had been stormy. On July 5, 1966, appellant and Patón had driven to Redding and on their return to Central Valley had stopped at the Shasta Dam Club for a drink. When they reached home, they began arguing and he accused her of having affairs with other men. Angered by this, she went out for a walk. When she returned 30 minutes later, he had left the residence and she, knowing he would be at the Shasta Dam Club, went there. She was sitting at the bar when he insisted that they go home, argued with her, poured her drink on the bar, grabbed her purse, and took her out of the premises. WTien they arrived home he again accused her of affairs with other men and began telling the children that their mother was a tramp. During the argument Patón threatened to have the children taken away from her as being an unfit mother. Appellant was swearing and using vile language toward Patón. She told him she was going to the Hitching Post, another bar, to have a drink and pick up a man. She went out the front door and around to the back of the house and came back in. Patón was telling her minor daughters how bad their mother was. Appellant left the living room to go into the bathroom and Patón followed her. In the bathroom they quarreled. Appellant hit him and bloodied
 
 *346
 
 his nose. He again accused her of “chippying” and “going out on him” and then, as she said because she couldn’t take the accusations of her sleeping with other men any longer she turned, walked into the kitchen, took a steak knife out of a drawer, walked back to where he was standing, and, with an overhand motion, drove the knife into his chest. She then took the knife back into the kitchen and washed off the blood. Patón went into the living room and lay on a couch. Appellant saw that he was bleeding quite badly and called for an ambulance. She then called the sheriff’s office, saying, “I just stabbed my husband.” The sheriff’s office sent a deputy who went to the scene. When he arrived, Patón was lying on the couch and appellant was kneeling alongside. The deputy greeted her and asked what happened. Appellant said, “The same thing as last time. I stabbed him again.” After the ambulance arrived and took Patón to the hospital, the sheriff’s deputy advised her as to her constitutional rights. His testimony as to the manner in which this was done was as follows: “T advised her that she had the right to remain silent, the right to consult an attorne;^. If she didn’t have the funds to secure one for herself, the Court would appoint her one, and also that anything she did say could be used in a court of law. ’ ’ He said he. asked if she understood what he had told her and if there were any questions that she might not be clear on, and she said that she understood what had been said to her. Thereupon the deputy sheriff questioned appellant concerning the circumstances of her having stabbed Patón.
 

 Thereafter appellant was taken to the sheriff’s office. After the above warning had been repeated to her, she gave a statement which was later reduced to writing and signed by her. At her trial, all inculpatory statements made by her, including her written statement, were introduced into evidence without objection. Her written statement was read as follows:
 

 “ ‘I have been advised I can consult an attorney and of my right to remain silent. I also have been advised I can have a Court appointed attorney if I have no fund. I also want to state no one had promised me anything if I give a statement.
 

 “ ‘Yesterday my husband Robert Patón and myself came to Redding from Central Valley where we live at 405 Flower Street, and arrived at approximately 12:00 noon. We stopped at the Clover Club and had two drinks apiece, and then went to the hospital to see our son. We then left and returned to the Central Valley area where we stopped at the Shasta Dam Club for a drink.
 

 
 *347
 
 “ ‘When we got inside the club two fellows who are friends of Bob’s, Dick Thorenson and Boy Barns put their arms around me and gave me a kiss on the cheek. I believe we had three drinks at the club in all and left for home.
 

 “ ‘When we arrived at home my children, Paula, age ten years, Toni, age seven, and Bobin, age seventeen months, were there. Bob started picking at me and saying I was sleeping with other men, and saying the kids were not behaving, and other little things. About this time I got up and went for a walk. I believe I was gone for approximately one-half hour, maybe longer, and when I returned Bob was not at home. A friend of mine, Mary Evans, came by, and I had her take me to the Shasta Dam Club, as I knew Bob would be there. I went there so we could talk our troubles out. When I arrived I had a couple of drinks, and Bob was playing pool. We never spoke until he came by and poured my drink out and said—’ Then there is a ‘let’s go, we,’ and that is crossed out, and there are the initials ‘ BJP. ’ ’
 

 “ ‘We never spoke until he came by and poured my drink out and said “I’m going home and you are going with me. ’’
 

 “ ‘When we got home he accused me again of sleeping with other men. He was sitting in a chair by the phone, and I was standing up. All this time we were arguing. I left the front room to go in the bathroom, and he followed, still arguing. I pushed him and told him to leave me alone. I told told [sic] to get me a blanket, as I was going to sleep outside on the pad.
 

 “ ‘I then entered the kitchen and Bob was talking all the time. I went to a drawer in the kitchen I knew had a knife, and got one out. It is approximately four or five inches long, a steak knife. I turned and walked back to where he was standing in the doorway, and I stabbed him once in the chest. I turned and threw the knife in the sink. Bob went into the front room and laid on the couch. I seen he was bleeding badly.
 

 “ ‘I then called the ambulance and then the Sheriff’s Office.
 

 “ ‘This statement is true and correct, to the best of my knowledge. ’ ”
 

 On appeal, by brief and argument, appellant advanced three contentions of error committed by the trial court:
 

 (1) To instruct on first degree murder because there was no evidence of premeditation. (2) To refuse to instruct on involuntary manslaughter. (3) To instruct that there is a presumption that if one acts as if she were conscious she is presumed to be conscious.
 

 The premeditation and deliberation necessary in
 
 *348
 
 the proof of a charge of first degree murder may be inferred from a variety of facts and circumstances and need not necessarily be proved by direct evidence
 
 (People
 
 v.
 
 Torres,
 
 214 Cal.App.2d 734 [29 Cal.Rptr. 706]); and first degree murder may be found even though the act of killing quickly follows the formation of the intention to kill if that intent was reached with deliberation and premeditation.
 
 (People
 
 v.
 
 Perrotta,
 
 224 Cal.App.2d 498, 504 [36 Cal.Rptr. 813].) Some of the factors which have been held to be ingredients in determining whether a killing was premeditated and deliberate have been the following: Prior quarrels between the defendant and the deceased
 
 (People
 
 v.
 
 Eggers,
 
 30 Cal.2d 676 [185 P.2d 1]); the use of a knife; and the fact that the wounds were not wild and unaimed but were in the area of the chest and the heart
 
 (People
 
 v.
 
 Morris,
 
 174 Cal.App.2d 193 [344 P.2d 333]); and the fact that defendant went to get a weapon
 
 (People
 
 v.
 
 Werner,
 
 111 Cal.App.2d 264 [244 P.2d 476]). In the present case the record shows that appellant left the doorway into the kitchen where she and Patón were arguing, walked 10 feet to a drawer where a knife was, picked up the knife and returned to the doorway, stabbed Patón with an overhand motion, the knife puncturing the heart, returned to the kitchen and rinsed the blood from the knife at the sink. There was ample evidence to support a finding of first degree murder and therefore to require an instruction defining that crime. There was no error in giving such an instruction.
 

 In support of appellant’s contention that the court committed prejudicial error in refusing to instruct on the offense of involuntary manslaughter, it is argued that appellant was hampered in that she did not remember the circumstances of the actual slaying. It is true that at trial appellant testified in her own behalf that she could not remember what happened during the vital period of time. She said that she could not remember anything between the point of time when she had left the bathroom and the point of time when she stood at the sink, washing the blood off the knife. A clinical psychologist testified as an expert witness that the things she did might have been done subconsciously and without her volition. This testimony does not help her in respect of the present assignment. That one acted unconsciously and without volition is a complete defense. One who so acts does not commit a crime at all. This defense was fully presented to the jury and instructions given thereon. The jury were told that if they found she so acted they should find her not guilty. The jury rejected
 
 *349
 
 this defense. Assuming her then to he conscious, she was not entitled to an instruction on involuntary manslaughter under the facts. There is no evidence that in stabbing Patón she acted negligently or in the commission of a non-felonious unlawful act. (Pen. Code, § 192.) Her own evidence shows the intentional use of a deadly weapon.
 

 There is no merit in appellant’s contention that the court erred in instructing the jury that where the evidence shows a person acted as if that person was conscious, the law presumes that he was conscious. The instruction given was as follows:
 

 “When a person commits an act without being conscious thereof, such act is not criminal, even though if committed by a person who was conscious it would be a crime.
 

 “This rule of law applies only to cases of the unconsciousness of persons of sound mind, as, for example, somnambulists or persons suffering from the delirium of fever, epilepsy, a blow on the head, or other cases in which there is no functioning of the conscious mind, and the person’s acts are controlled solely by the subconscious mind.
 

 “When the evidence shows that a person acted as if she was conscious, the law presumes that she then was conscious. The presumption, however, is disputable and may be overcome or shown to be untrue by evidence to the contrary.
 

 “If you should find that the defendant committed an act, which, if she was conscious, would have constituted the crime charged against her, or would have been an element of that crime, and if you have reasonable doubt whether the defendant was conscious at the time of such act, you should find that she was then unconscious.” In
 
 People
 
 v.
 
 Hardy,
 
 33 Cal.2d 52, at page 63 [198 P.2d 865], our Supreme Court stated that there is no statutory presumption that a man is conscious merely because he acted as if he were conscious, but that such a presumption appeared to have been recognized by judicial decision. The instructions given were taken from CALJIC, being instructions therein numbered 71-C and 71-D. By these instructions the jury were plainly told that if the evidence was such as to raise a reasonable doubt as to whether the defendant was conscious at the time of her act, they should find her unconscious, that is to say, they should find her not guilty. We think the instructions were correct.
 

 The foregoing disposes of the three contentions for reversal urged by appellant in her brief and upon oral argument. After argument, however, this court wrote counsel, stating that it
 
 *350
 
 appeared to the court the ease might involve the
 
 Miranda
 
 rule
 
 (Miranda
 
 v.
 
 Arizona
 
 (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), because of the admission into evidence of appellant’s statements heretofore discussed and noted, and asked counsel to file supplemental briefs on that question. These briefs have been filed. As we have stated, no objections were made to the introduction of any of her statements, and the Attorney General first contends that such an objection should be declared to be an essential prerequisite to challenging a confession or incriminating statement on appeal in eases where the basis for the objection existed at the time of the trial. (Citing
 
 People
 
 v.
 
 Doherty
 
 (July 10, 1967) 67 Cal.2d 9 at pp. 14-16 [59 Cal.Rptr. 857, 429 P.2d 177];
 
 People
 
 v.
 
 Cabrellis,
 
 251 Cal.App.2d 681, 684-686 [59 Cal.Rptr. 795];
 
 People
 
 v.
 
 Hohensee,
 
 251 Cal.App.2d 193, 205-206 [59 Cal.Rptr. 234] ;
 
 People
 
 v.
 
 Lozano,
 
 250 Cal.App.2d 58, 60 [58 Cal.Rptr. 102]
 
 ; People
 
 v.
 
 Larke,
 
 246 Cal.App.2d 571, 575 [54 Cal.Rptr. 834].)
 

 We think it unnecessary to discuss this point because we believe that, assuming error by receiving her statements into evidence, this court, from a view of the whole record, can and must declare its belief that such error was harmless beyond a reasonable doubt.
 
 (Chapman
 
 v.
 
 California,
 
 386 U. S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) Before discussing the matter further, we note that the crime charged here was committed July 5,1966, subsequent to the decision of the Supreme Court in
 
 Miranda.
 
 The trial began August 9, 1966, and therefore, the rule declared in
 
 Miranda
 
 touching custodial interrogation of a suspect is controlling. Appellant made four incriminating statements prior to the making of the written statement hereinbefore quoted. The first statement was made to Officer Perkins, a deputy jailer in the office of the Shasta County sheriff at 10:31 p.m. on July 5, by way of a telephone call from appellant in which she said, ‘1 Get a deputy out here quick, and send an ambulance. It is Betty Patón. I just stabbed my husband.” Deputy Sheriff Eoff, then on duty about two blocks distant from the Patón residence, was directed to proceed to the Patón home. His testimony, uncontradicted, as to what occurred when he entered the residence, follows: “Q. What did you say upon your entry ? A. I pushed the door open hesitated until Mrs. Patón noticed that I was there. I said ‘hello.’ She spoke and I proceeded to the couch. Q. Did you say anything when you were walking to the couch? A. Yes, I said ‘hello Betty,’ and she said ‘hello.” I said, ‘what happened ?’ and she says, ‘the same thing as last time. I stabbed
 
 *351
 
 him again. ’ ’ ’ The officer testified that at this time his primary concern was the care of Patón. This was appellant’s second statement. When the ambulance had taken Patón away, Mrs. Patón asked Deputy Eoff what the procedure would be and he told her that she would probably accompany him to the sheriff’s department. He then advised her of her constitutional rights as hereinbefore stated. He then questioned her, “asked her questions relevant to the ease, as to what had started the incident,” and she “stated it was a family argument.” The record then shows the following: “Q. Did she say specifically what the argument was about? A. Just that Mr. Patou had accused her of going out on him, and chippying. Q. What did she say about that ? A. This is what she told me upsets her, and the argument got somewhat heated. Q. What did she say happened then? . . . Q. What did she say as to what happened after the argument ? A. She said that she wanted to go outside of the residence, in back, to get away from Mr. Patón. Q. Did she make any other statements as to what happened following this statement of the desire to leave the residence? A. Not that I recall. She stated that about this time when he accused her of this she took a knife from the drawer and proceeded to stab him. Q. Did she indicate to you her state of mind at the time she stabbed him? A. No, she did not. Q. Did she indicate to you the drawer from which she had obtained the knife ? A. Yes. This was a drawer located on the lower right-hand side from the sink. . . . Q. Did she indicate to you where the stabbing took place? A. Yes. I questioned her as to where the incident took place. I walked to an approximate area she stated it happened, and which was located just into the kitchen from the hall. She walked over to this area and indicated she thought this was where it occurred. . . . Q. Did she indicate to you what she had done with the knife ? A. Yes. I asked her what she had done with the weapon. She stated she had threw it back into the kitchen sink. Q. Did she indicate to you anything at all about what happened to the knife after that ? A. No, she did not. . . . Q. Was there any conversation about the facts of this ease during your drive from the Patón residence to the Sheriff’s Office ? A. No, there were not. ’ ’
 

 After arrival at the sheriff’s office, there came a call from the hospital with the surgeon’s request for information as to the position of appellant and Mr. Patón when the stabbing occurred. This precipitated appellant’s fourth statement. She stated to Eoff, who was at the telephone, that she stood to
 
 *352
 
 Patón’s left and used an overhand motion when she stabbed him. Eoff relayed the information to the surgeon.
 

 Appellant’s fiifth statement was the one made in writing.
 

 Appellant’s first statement, made when she called the sheriff’s office to inform them that she had stabbed her husband, and requesting a deputy and an ambulance, was a voluntary statement made before any investigation was begun, and was admissible under
 
 Miranda.
 
 The same is true as to her second statement to Eoff when he arrived at her residence. It appears that the officer did not know anything about the crime. Mrs. Patón was not in custody and no investigation had been begun. This statement was admissible without any warning given her as to her rights.
 
 (People
 
 v.
 
 Modesto,
 
 66 Cal.2d 695, 706 [59 Cal.Rptr. 124, 427 P.2d 788];
 
 People
 
 v.
 
 Jacobson,
 
 63 Cal.2d 319, 328 [46 Cal.Rptr. 515].) Appellant’s fourth statement as to the way the blow was struck was not part of an investigation initiated by the officers nor was it for the purpose of eliciting incriminating statements. Its purpose was not to get a confession but an explanation.
 
 (People
 
 v.
 
 Allison,
 
 249 Cal.App.2d 653, 658 [57 Cal.Rptr. 635];
 
 People
 
 v.
 
 Warrick,
 
 249 Cal.App.2d 1, 4 [57 Cal.Rptr. 121].) A surgeon at the hospital, endeavoring to save the life of Patón, needed and asked for the information for his own use, and appellant’s reply was admissible under
 
 Miranda.
 

 Her third, and her written statements, however, were clearly given while appellant was in custody, and the purpose of her interrogation was the eliciting of incriminating statements. The warning given, although sufficient under the
 
 Escobedo-Dorado
 
 rule, was insufficient under the
 
 Miranda
 
 rule in that it did not specifically tell her that she had a right to have an attorney, either self-selected or appointed, present before questions were asked. The Attorney General concedes this insufficiency. These statements were tantamount to confessions of voluntary manslaughter. Their admission would ordinarily, at least if objected to, require reversal per se.
 
 (People
 
 v.
 
 Powell,
 
 67 Cal.2d 32, at pp. 51-52 [59 Cal.Rptr. 817, 429 P.2d 137], and cases cited.) But this case falls under the exception to the reversible per se rule stated in
 
 People
 
 v.
 
 Jacobson, supra,
 
 63 Cal.2d 319, and in
 
 People
 
 v.
 
 Cotter,
 
 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862], Her third and fifth statements added nothing to the essentials of the crime of voluntary manslaughter not contained in her admissible statements. The statements do not contradict each other in any substantial degree and her third and fifth could not have had any material effect on the outcome of the trial.
 

 
 *353
 
 Since we are satisfied beyond a reasonable doubt that any error in the receipt in evidence of appellants’ third and fifth statements was harmless we cannot reverse therefor.
 
 (Chapman
 
 v.
 
 California, supra,
 
 386 U. S. 18.)
 

 The order denying probation is not appealable and the purported appeal therefrom is dismissed. The judgment is affirmed.
 

 Friedman, Acting P. J., and Regan, J., concurred.
 

 *
 

 Betired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.