Filed 10/5/20  P. v. Dao CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B298545 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA454112) |
| v. | |
| VINH DAO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed as modified.

Mark R. Feeser, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Kristen S. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

Defendant and appellant Vinh Dao appeals his convictions of two counts of first degree murder, for which he was sentenced to consecutive terms of life without the possibility of parole.  He argues there was insufficient evidence of deliberation and premeditation and the trial court erred in admitting evidence of prior bad acts.  He also argues he did not knowingly or voluntarily stipulate to his prior manslaughter conviction, which added five years to his sentence.  Finally, he contends the abstract of judgment must be amended to reflect the correct amount of victim restitution.

We affirm the first degree murder convictions and order the abstract of judgment modified to reflect the accurate amount of victim restitution.

# II.  BACKGROUND

A.    *Defendant's Return to Los Angeles*

In January 2017, defendant moved back to Los Angeles from Las Vegas because he was having problems with his ex-girlfriend and their children.  On January 20, 2017, his car broke down and was towed and stored in Los Angeles.  He contacted a friend, who took him to a dinner party.  Also present was victim Tony Young, the newly-elected president of the Hop Sing Tong Benevolent Association (Hop Sing).  The dinner took place in downtown Los Angeles at a local restaurant.  Several other Hop Sing members attended the dinner.  During the evening, a waiter moved a walking cane that defendant had brought with him,

2

revealing five to six inches of a concealed knife. The dinner was otherwise uneventful. Following dinner, Young gave defendant money to help defendant retrieve his vehicle from the impound. The amount apparently was insufficient, and defendant was unable to get his car.

B. *The Murders*

One week later in the early afternoon of January 26, 2017, defendant sat at a table and ordered food at Plum Tree Inn restaurant in Chinatown (Plum Tree). A witness testified that Plum Tree was "about 370 feet" from where Hop Sing was located. Defendant later left Plum Tree without paying for his food, and, on his way out, stole a decorative statue from the restaurant.

At about the same time, victims Young and Kim Kong Yun were playing Mahjong in the large hall-like room that was the bottom floor of Hop Sing. Ten to 20 members and guests were in the area. Defendant entered Hop Sing through the front door carrying a bag. He walked to the back door where he placed the statue stolen from Plum Tree.

Defendant approached Yun at the Mahjong table and requested to stay overnight at Hop Sing. Yun, who had a managerial role at Hop Sing, refused. Defendant loudly said to Yun, "Fuck you mother. Fuck you." An eyewitness said Yun also rejected defendant's effort to borrow a car. Yun accused defendant of not returning another car he had already borrowed. Defendant responded, "Fucking—fuck you . . . ." Defendant then began talking loudly on his cellphone. Yun and Young both told defendant to quiet down.

3

An eyewitness testified that Yun told defendant to leave. Defendant refused and Yun repeated his request. According to the witness, Yun began pushing defendant toward Hop Sing's front door. Yun pushed defendant "in a very rude way, meaning he was insistent that he must leave." At the door, Yun angrily argued with defendant and told him to leave. Another eyewitness testified that he did not see Yun push defendant. Still another eyewitness testified that he did not see Yun or Young push defendant—during the "whole encounter" "no one pushed him."

Yun and defendant continued to argue at the front door for about a minute.[1] Defendant then withdrew a knife from his waistband or pocket, held it high, and stabbed Yun twice—once on his left arm and once on the left side of his neck. The stab wound to Yun's neck was fatal.[2] The wound traveled five inches through Yun's neck, fracturing Yun's spinal cord and lacerating his vertebral artery. As defendant attacked Yun, Young fled toward a stairwell. Defendant then chased Young and stabbed him seven times in his neck and chest, also fatally wounding Young.

Defendant ran out Hop Sing's back door and crashed into a trash bin near a woman and her daughter. The woman saw defendant holding a nine-inch-long, sheathed knife. Defendant appeared to be bleeding and the knife was dripping blood. He told the woman that he had cut himself and then ran toward a

---

[1]     One of the four eyewitnesses stated Young was arguing with defendant as well.

[2]     This knife was not the same knife from the walking cane seen at the earlier dinner party.

4

nearby alley. Police observed a trail of blood in the direction defendant ran. Along the path, police found a black, bloodstained glove on a gate. The blood trail and blood on the glove contained DNA consistent with defendant's profile. None of the bloodstains tested matched the DNA profiles of Yun or Young.

Later that day, defendant was treated at Huntington Memorial Hospital for a left hand laceration. Defendant told hospital staff he cut himself while playing with a knife. Defendant left the hospital before his scheduled surgery.

The next day, police arrested defendant who was sitting on a bench in Alhambra. On his person, police found a large knife, with a six-and-a-half inch sheathed blade. Defendant's backpack contained a sheathed machete, paperwork from Huntington Memorial Hospital dated January 26, 2017, two receipts from Sprint at Radio Shack dated January 27, 2017, a Boost cell phone, an iPhone, and a map covered in bloodstains. Testing revealed the presence of blood on the sheath, backpack, map, glove, and on defendant's shoes and pants.

C.    *The Charges*

The People charged defendant with two counts of murder in violation of Penal Code section 187, subdivision (a)[3]—count 1 for Young's murder and count 2 for Yun's murder. As to both counts, the information alleged that defendant committed multiple murders (§ 190.2, subd. (a)(3)), personally used a knife (§ 12022, subd. (b)(2)), and had a prior conviction for voluntary manslaughter, which qualified as both a strike conviction as

---

[3]    All subsequent statutory references are to the Penal Code unless indicated otherwise.

5

defined by the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and a serious felony (§ 667, subd. (a)(1)). Defendant pleaded not guilty.

D.    *The Trial*

On April 2, 2019, defendant's jury trial commenced.  The People presented testimony from five eyewitnesses to the murder and surrounding events, from police officers, and from the medical examiner.  Their testimony was consistent with the events we have previously described.  Over defendant's objection, the People presented Evidence Code section 1101, subdivision (b) evidence of the following three prior bad acts to prove knowledge or lack of mistake, premeditation, motive, intent, and common plan or scheme.[4]

1.    <u>Bad Acts Evidence</u>

The parties stipulated that defendant was convicted of voluntary manslaughter and assault with a deadly weapon in 2002.  Tam Tieu (a victim of the assault and the friend of the deceased victim Hong La) and the coroner testified about the incident.  Following an argument inside a nightclub, defendant and La fought outside.  Defendant had a knife and stabbed La four times, killing him; La was unarmed.  Tieu ran as defendant

---

[4]    We address the People's successful motion to admit this evidence in the Discussion section below.  Although the People argued additional theories, the trial court instructed the jury that it could consider the evidence to prove identity, motive, intent, and common plan or scheme.

said, "[A]nybody wants to join?" Defendant chased Tieu and cut him on the back with the knife. Tieu was able to escape. His injury did not require medical treatment.

The People also introduced testimony from S.A., plaintiff's ex-girlfriend and mother of his children. She testified that early in their 10-year relationship, defendant told her that as a child, his physical education class consisted of "training" "like if they had to go to war or whatever, so they trained them in defense and like how to pinpoint I guess—I don't know how you put it—points of fatality or whatever." According to S.A., defendant carried knives "most of the time," ranging from a pocketknife to a machete. In 2015, defendant threatened to slit her throat and kill their children if she left him or did not let him see the children. Defendant never actually used a knife against her or the children. S.A. eventually obtained a protective order against defendant, and they separated in 2014 or 2015.

The third incident came in through the testimony of a delivery driver. On January 3, 2016, the driver was making a stop at a convenience store in Las Vegas and heard two men screaming in the parking lot. She watched defendant swing a knife at the other man and then chase, and try to kick the man. Defendant did not actually stab the man. By the time police arrived, defendant was hugging the victim.

2. Defendant's Testimony

Defendant was the only defense witness. He testified that he was not responsible for Yun's or Young's death. Defendant stated that as a child, he witnessed daily violence living in a refugee camp in Hong Kong. When defendant was 13, he moved

7

to Los Angeles to live with his grandfather. His grandfather was a Hop Sing member, and defendant joined in 1997.

After killing La in 2002, defendant turned himself in, telling police he "shanked him with a knife," and he was very sorry. Defendant explained that La and as many as six other individuals jumped him before the stabbing, causing defendant to overreact based on his childhood experiences in the refugee camp. Defendant denied chasing or cutting Tieu after fatally stabbing La.

After his voluntary manslaughter conviction and time in prison, defendant moved to Las Vegas, where he and S.A. started a family. Defendant was no longer associated with Hop Sing. Defendant denied that he routinely carried knives and denied threatening S.A. or their children. He admitted he may have been emotionally abusive toward S.A. Defendant and S.A. eventually broke up, and by January 2017, the month of the murders, defendant was in the process of moving back to California.

As to the days leading up to the Yun and Young stabbings, defendant testified that Young gave him $400, which was not enough to get his vehicle out of impound. On January 26, 2017, a part owner of Plum Tree told defendant to take a statue from the restaurant and bring it to Hop Sing. He stated the waiter permitted defendant to write his name on a piece of paper rather than pay the bill because Plum Tree and Hop Sing were affiliated.

Defendant testified that he went inside Hop Sing to find Young, unconscious on a staircase, and Yun, on the ground in a corner. Yun was still alive and appeared to be reaching out to defendant. There was blood spatter everywhere.

8

Defendant testified that he considered performing first aid until he noticed a man with a gun and another with a knife inside Hop Sing. Two or three people came toward defendant and the man with the knife attacked defendant, causing him to fall backwards onto a table. Defendant grabbed the attacker's hand, and when the attacker tried to pull back the knife, defendant's hand was cut.

Defendant testified that he fled Hop Sing through a rear door, telling bystanders to call 911 because there had been a shooting. Defendant then ran through an alley toward Hill Street. He found a glove, which he tried to use to control the bleeding on his hand. The glove was too small, and he placed it on a door handle so that someone might call 911. Fearing for his life, defendant also purchased a knife and a machete from a shop near Hop Sing. He said he did not seek help from police because he was in shock. Defendant did not recall seeing the mother and child outside Hop Sing and did not know how a bloody sheath with DNA matching his profile ended up in that location.

Defendant stated he then took a bus to a hospital to address his hand injury. He left the hospital against doctor's orders before his scheduled surgery because he wanted to find out what happened to Young. Defendant purchased a new phone, which he said was cheaper than reactivating his old phone that had a dead battery.

### 3. The Jury's Verdict

The jury found defendant guilty of both murders, found both murders to be in the first degree, and found true the allegations that defendant used a knife, committed multiple

9

murders, and had suffered a prior conviction for voluntary manslaughter, a serious felony.

E.      *Sentencing*

The trial court imposed consecutive terms of life without the possibility of parole for each murder conviction based on the multiple murder special circumstance enhancements.  The court imposed consecutive one-year determinate terms on each count for the personal use of a deadly weapon.  The court ordered defendant to serve a consecutive five-year term for his prior serious felony conviction.  In aggregate, the court sentenced defendant to a determinate term of seven years consecutive to two consecutive terms of life without the possibility of parole.

## III.  DISCUSSION

A.      *First Degree Murder Convictions*

1.      <u>Applicable Law</u>

First degree murder requires both deliberation and premeditation; second degree murder does not.  (§§ 187, subd. (a), 189; *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1111 (*Nazeri*).)  "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.  [Citations.]  [Citation.]  Premeditation and deliberation can occur in a brief interval.  The test is not time, but reflection.

10

Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. [Citation.] [Citations.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 (*Mendoza*) [some internal quotation marks omitted].)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court identified three types of evidence that are useful in determining whether there was sufficient evidence of deliberation and premeditation—planning activity, preexisting motive, and the manner of killing. (*Mendoza, supra*, 52 Cal.4th at p. 1069.) "'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' [Citations.] Or as [a court has] phrased it before, the factors do not impose 'a straightjacket on the manner in which premeditation can be proven adequately at trial.' [Citation.]" (*People v. Williams* (2018) 23 Cal.App.5th 396, 410.)

Deliberation and premeditation do not require an extended period of time. "'The true test is not the duration of time as much as it is the extent of the reflection.'" (*People v. Cage* (2015) 62 Cal.4th 256, 276.) Premeditation does not require cool, measured planning. (*Ibid.*; *Nazeri, supra*, 187 Cal.App.4th at p. 1114.) An intentional killing is deliberate and premeditated if it resulted from "preexisting thought," rather than "rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

Defendant contends there was insufficient evidence of deliberation or premeditation as to either murder. We review the record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a rational trier of fact could find defendant guilty beyond a reasonable doubt. (*Mendoza, supra*, 52 Cal.4th at pp. 1068–1069.)

11

2.    Yun's Murder

Defendant argues that the evidence shows Yun's murder was a rash act, the result of provocation.  Further, he argues that the *Anderson* factors demonstrate that there was no deliberation and premeditation.  We disagree.

The *Anderson* and other factors supported the jury's finding that Yun's murder was deliberate and premeditated.  First, defendant had a motive.  Yun had refused defendant's requests to stay overnight at Hop Sing and to borrow a car, he had told defendant to quiet down while defendant was speaking loudly on his cell phone, and he had asked defendant to leave Hop Sing. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1238 ["the incomprehensibility of the motive does not mean that the jury could not reasonably infer that the defendant entertained and acted on it"].)

Second, the manner in which defendant stabbed Yun supported a finding of deliberation and premeditation. Defendant stabbed Yun in the neck, a vital area, and S.A. testified that defendant was trained as a child to pinpoint areas of fatality on a person's body.  A stab wound to a vital area "'is indicative of a reasoned decision to kill.'"  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1293 [throat cutting is evidence of a reasoned decision to kill]; *People v. Paton* (1967) 255 Cal.App.2d 347, 352 ["the fact that the wounds were not wild and unaimed but were in the area of the chest and the heart" is evidence of deliberation and premeditation]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [shooting the victim in the neck from within a few feet was a "method of killing sufficiently "'particular and exacting'" to permit an inference that defendant was 'acting according to a

12

preconceived design' . . .".) Further, defendant pulled the knife out of his waistband or pocket and held it over his head before killing Yun. The jury could have inferred, as the prosecutor argued, that defendant continued to premeditate the killing during this period of time.

Third, defendant's stabbing of Yun was not an isolated event. Defendant had a history of arming himself with a knife and using or threatening to use the knife when angry. (See *People v. Solomon* (2010) 49 Cal.4th 792, 815 ["'the more often one does something, the more likely that something was intended, and even premeditated, rather than accidental or spontaneous'"].) In 2001, defendant stabbed La to death, cut Tieu, and was sent to prison. The jury reasonably could have concluded that while incarcerated defendant had thought about the adverse consequences of his criminal acts but, when released, nevertheless decided to arm himself again with a knife and resolve conflicts by stabbing those with whom he was angry. In 2015, he threatened to slit S.A.'s throat and kill their children if she left him or did not let him see their children. In 2016, defendant swung a knife at and chased a man he had argued with at a convenience store parking lot in Las Vegas. In this case, after stabbing Yun to death, defendant chased and fatally stabbed Young.

In reaching our conclusion, we recognize that there was ample evidence introduced at trial from which a trier of fact could have concluded, as defendant argues, that the murder was a rash and impulsive act resulting from provocation, and not the result of deliberation and premeditation. For example, there was testimony that Yun pushed defendant in a rude manner during their argument, and that Young and others gathered by

13

defendant at the door.  But the testimony that supports the argument for provocation, and a reaction without reflection by defendant, is contradicted by other testimony:  for example, witnesses within a few feet of defendant and the victims said that they saw no pushing and even that there was no pushing.  It was the jury's role, and it is not ours, to resolve such conflicts in the evidence.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181 ["In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]"].)  Here, defendant and the prosecution expressly argued the issue of deliberation and premeditation to the jury, drawing on the trial evidence noted above.  We cannot say that the jury did not have substantial evidence to support its verdict that defendant deliberated and premeditated the killing of Yun and to reject the argument in closing by defendant's counsel that defendant had been provoked by Yun pushing him, Young following close behind, and both of them arguing with him.

    3.    <u>Young's Murder</u>

    Sufficient evidence also supported a finding of deliberation and premeditation in Young's murder.  After murdering Yun at the front door, defendant had time to reflect.  He chose not to leave through the nearby front door but to chase down Young across the room as Young was heading toward a stairway at the back of Hop Sing.  A few moments earlier Young had asked defendant to quiet down when defendant was speaking loudly on his cell phone.  What happened next was primarily a conflict

14

between Yun and defendant. Eyewitness testimony indicated that Young attempted to dissolve tension between defendant and Yun, immediately before defendant killed Yun.[5] Following Yun's murder, defendant chased Young, who was by then across the room. Although no one testified about the time between the original encounter when defendant asked if he could stay at Hop Sing and the Young killing, the jury could have reasonably found that that it took more than a minute. This gave defendant plenty of time to deliberate and premeditate the Young murder.

Defendant chose not to flee the scene to avoid apprehension for the Yun murder, but instead decided to stab Young seven times in the neck and chest. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1018 [evidence supported first degree premeditated murder of second victim where defendant suddenly shot the first victim, and then chased and fatally shot second victim]; *People v. Concha* (2010) 182 Cal.App.4th 1072, 1090 [confronting, chasing, cornering, and repeatedly stabbing the victim supports a finding of premeditation and deliberation].) Thus, even if defendant had not deliberated and premeditated Yun's murder—and we conclude that he did—"premeditation and deliberation could be inferred when he killed again . . . in the same manner." (*People v. Solomon, supra*, 49 Cal.4th at p. 829; *People v. Steele* (2002) 27 Cal.4th 1230, 1244.)

---

[5] We observe that three eyewitnesses indicated the arguing took place between defendant and Yun, and Yun moved defendant toward the front door. One witness stated that both Yun and Young argued with defendant.

B.    *Uncharged Bad Acts Evidence*

Defendant contends the trial court erred when it "permitted the prosecution to present highly prejudicial prior bad acts evidence to prove identity, intent, motive, and a common plan or scheme."  He asserts the prior acts were not sufficiently similar to the charged offenses and had no relevance beyond impermissible inferences about defendant's propensity to commit crimes with a knife.[6]

1.    Relevant Proceedings

Before trial, the prosecution moved to admit evidence of defendant's 2001 voluntary manslaughter and assault with a deadly weapon, the 2015 threats against S.A. and their children, and the 2016 incident where defendant chased a man with a knife in a parking lot.  In their pretrial brief, the People argued that, under Evidence Code section 1101, subdivision (b), the voluntary manslaughter and 2016 assault were admissible to prove identity and that all three prior bad acts were admissible to prove intent, common plan, motive, and knowledge, and to negate any claim of self-defense.  Defendant filed an opposition asserting the evidence was not probative and was unduly prejudicial.

The trial court heard argument on the motion.  The People asserted S.A.'s testimony was admissible to show premeditation

---

[6]    Defendant concedes that the prior acts all involved knives. This alone is strong evidence of common plan or scheme.  (See *People v. Lancaster* (1957) 148 Cal.App.2d 187, 194 [multiple instances of luring a victim to secluded place and use of a knife to restrain victim during robbery show common scheme or plan].)

16

and intent, the 2016 assault was admissible to show intent, and the 2001 manslaughter was admissible to prove common scheme or plan, intent, and premeditation. The court ruled it would admit the voluntary manslaughter to establish defendant's knowledge of what a knife can do and the lack of accident. The court also found the incident relevant for the reasons the People argued, i.e. common scheme or plan, intent, and premeditation. The court permitted the People to introduce the parking lot assault for intent, noting that intent evidence requires the "least amount of similarity." The court allowed into evidence S.A.'s testimony but limited it to defendant's use of and threats with knives. The court excluded evidence of two other incidents the prosecution had sought to present.

At the close of the trial, the court instructed the jury that if the People proved by a preponderance of the evidence that defendant committed (1) the voluntary manslaughter of La on June 10, 2001, (2) a criminal threat against S.A. in April 2015, and (3) an assault with a knife on an unidentified man in Las Vegas on January 3, 2016, the jury may consider that evidence for the limited purpose of deciding whether:

> "Defendant was the person who committed the offenses alleged against him in this case; or
> "Defendant had a plan or scheme to commit the offenses alleged in this case; or
> "Defendant had a motive to commit the offenses alleged against him in this case."

The court directed the jury not to "conclude from this evidence that defendant ha[d] a bad character or is disposed to commit crimes." The court instructed: "If you conclude that defendant committed the uncharged acts, that conclusion is only one factor

17

to consider along with all the other evidence.  It is not sufficient by itself to prove that . . . defendant is guilty of the offenses charged in this case.  The People must still prove every charge beyond a reasonable doubt."

### 2. Applicable Law

Evidence of other crimes or bad acts is generally inadmissible when offered to show a defendant's criminal disposition or propensity to commit the crime charged.  (Evid. Code, § 1101, subd. (a); *People v. Robertson* (2012) 208 Cal.App.4th 965, 989.)  However, that evidence may be admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."  (Evid. Code, § 1101, subd. (b); *People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*).)  The requisite degree of similarity differs depending on the purpose of the evidence.

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.]  . . .  In order to be admissible to prove intent, the uncharged conduct must be sufficiently similar to support the inference that the defendant probably harbor[ed] the same intent in each instance." (*Foster, supra*, 50 Cal.4th at p. 1328 [internal quotation marks and citations omitted].)

When using the uncharged act to show knowledge, "the degree of similarity required depends on the specific knowledge at issue and whether the prior experience tends to prove the knowledge [the] defendant is said to have had in mind at the time

18

of the crime." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 241.)  To "establish knowledge when that element is akin to absence of mistake, the uncharged events must be sufficiently similar to the circumstances of the charged offense to support the inference that what defendant learned from the prior experience provided the relevant knowledge in the current offense." (*Id.* at pp. 242–243.)

"A greater degree of similarity is required in order to prove the existence of a common design or plan. . . .  [E]vidence of uncharged misconduct must demonstrate not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations." (*Foster, supra*, 50 Cal.4th at p. 1328 [internal quotation marks and citations omitted].)  "Evidence of a common design or plan . . . is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394 (*Ewoldt*).)

"The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity . . . .  [T]he uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.  The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.  The highly unusual and distinctive nature of both the charged and [uncharged] offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense." (*Foster, supra*, 50

19

Cal.4th at p. 1328 [internal quotation marks and citations omitted].)

The admission of uncharged bad acts evidence is subject to the balancing test under Evidence Code section 352. Relevant evidence may be excluded if its probative value is substantially outweighed by the possibility that it will "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *Foster, supra,* 50 Cal.4th at p. 1328.) "Evidence is prejudicial within the meaning of Evidence Code section 352 if it '"uniquely tends to evoke an emotional bias against a party as an individual"' [citations] or if it would cause the jury to '"'prejudg[e]' a person or cause on the basis of extraneous factors."'" (*People v. Cowan* (2010) 50 Cal.4th 401, 475.)

Here, the trial court admitted three instances of prior misconduct: the 2001 voluntary manslaughter, 2015 criminal threats, and the 2016 assault with a deadly weapon to prove knowledge or lack of mistake, premeditation, motive, intent, and common plan or scheme, and instructed the jury on admission of the evidence for the purpose of proving identity, common plan or scheme, and motive.[7] We review the court's decision to admit or

_____

[7] The People point out that defendant does not allege instructional error. The People nonetheless state that the trial court misinstructed the jury: "Respondent agrees that the three incidents of prior misconduct were not sufficiently similar to the charged offenses to be admitted to prove identity, common plan or scheme, or motive as the instruction provided. However, this error was harmless as it is not reasonably probable [defendant] would have obtained a more favorable result had the jury been properly instructed." We agree that any such error was

20

exclude evidence for abuse of discretion.  (*People v. Mungia* (2008) 44 Cal.4th 1101, 1130.)

### 3.     2001 Voluntary Manslaughter

The 2001 voluntary manslaughter and the 2017 charged murders were relevant to defendant's intent and lack of mistake. That defendant had previously stabbed a victim, killing him, and then chased a second victim and attacked him with a knife demonstrated that when defendant stabbed Yun and Young he did so with the intent to kill and not as a result of mistake.

The 2001 homicide and assault were more probative than prejudicial.  It was probative because the striking similarities between the two incidents tended to show that defendant was the killer.  There was little likely prejudice because the 2001 attack was not prone to inflame the passions of the jury.  (*Ewoldt, supra*, 7 Cal.4th at p. 405 ["The testimony describing defendant's uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses.  This circumstance decreased the potential for prejudice, because it was unlikely . . . that the jury's passions were inflamed by the evidence of defendant's uncharged offenses"].)  The earlier incident involved the killing of one man, not two; defendant was previously convicted of the lesser crime of voluntary manslaughter; and he testified that the 2001 killing was in self-defense.  Nothing in the record suggested the 2001 crimes were more heinous than the murders of Yun and Young.  Although defendant is correct that the 2001 crimes were somewhat remote,

harmless.  As defendant does not argue instructional error, we do not address this point further.

when considered with the other bad acts that took place in 2015 and 2016, they showed a pattern of knife attacks, some of which were fatal.

4. 2015 Criminal Threats

Defendant's ex-girlfriend S.A. testified that defendant routinely carried knives, told her he knew how to strike vital parts of the body, and in 2015, had threatened to slice her throat and kill their children. Two years later, defendant cut and stabbed the throats of both Yun and Young with a knife he carried on his person. S.A.'s testimony about defendant's threat of extreme violence, i.e. his intent to kill her by slashing her throat and his intent to kill the children in response to her leaving him, is probative of defendant's intent in the present killings. Her testimony also tended to defeat any claim by defendant that he acted out of mistake. As to prejudice, threats of violence, even as horrifically described by the girlfriend, are not as inflammatory as the completed crimes for which defendant was on trial.

5. 2016 Assault With a Deadly Weapon

Lastly, in both the charged murder of Young and the 2016 assault with a deadly weapon, defendant pursued a fleeing victim, while brandishing a knife. His 2016 actions show that defendant had, in the recent past, acted in a manner similar to his actions in murdering Young. The 2016 assault is probative of defendant's intent to kill and lack of mistake. It also supports the People's premeditation theory of Young's murder. Given that

22

defendant had been in this victim-chasing situation before, a jury could infer he contemplated killing Young before he stabbed him. (See *People v. Solomon, supra*, 49 Cal.4th at p. 829 [inferring premeditation where defendant acted repeatedly in same manner].)

For reasons which we have given for the other Evidence Code section 1101, subdivision (b) acts, the 2016 assault evidence also survives defendant's challenge under Evidence Code section 352.

C.    *Admission of Prior Manslaughter Conviction*

Defendant contends the jury's finding that defendant suffered a prior conviction for voluntary manslaughter and the corresponding five-year sentence enhancement must be reversed because the trial court failed to advise defendant of his *Boykin-Tahl*[8] rights.  It is undisputed that the court did not advise defendant of his constitutional rights and sentencing consequences of admitting his prior conviction prior to counsel's stipulation.  We nonetheless conclude that under the totality of the circumstances, defendant's admission was voluntary and intelligent.

In obtaining an admission to the truth of a prior conviction that subjects a defendant to increased punishment, a trial court must "inform the defendant of three constitutional rights—the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers—and solicit a personal waiver of each."  (*People v. Cross* (2015) 61 Cal.4th 164,

---

8      *Boykin v. Alabama* (1969) 395 U.S. 238, 243–244 (*Boykin*); *In re Tahl* (1969) 1 Cal.3d 122, 130–133 (*Tahl*).

170 (*Cross*).) These are commonly referred to as *Boykin-Tahl* advisements. (*Id.* at p. 179.) Our Supreme Court has established a "'judicially declared rule of criminal procedure' that an accused, before admitting a prior conviction allegation, must be advised of the precise increase in the prison term that might be imposed, the effect on parole eligibility, and the possibility of being adjudged a habitual criminal." (*Id.*, at pp. 170–171, quoting *In re Yurko* (1974) 10 Cal.3d 857, 864.)

In *Cross, supra*, 61 Cal.4th 164, the Supreme Court held that where defendant was not advised of his rights when stipulating to a prior, "the test for reversal is whether 'the record affirmatively shows that the [admission] is voluntary and intelligent under the totality of the circumstances.'" (*Id.* at p. 171; *People v. Farwell* (2018) 5 Cal.5th 295, 302.) In applying the totality of the circumstances test, we review the whole record and consider a defendant's previous experience in the criminal justice system, which is relevant to his knowledge and sophistication concerning his legal rights. (*Cross, supra*, 61 Cal.4th at pp. 179–180.)

Here, defendant had extensive prior experience with the criminal justice system and had previously pleaded guilty to manslaughter in 2002. We may reasonably infer that defendant was admonished of his rights prior to entering the guilty plea. More fundamentally, defendant testified at trial to committing the manslaughter that formed the basis of the prior conviction allegation and to serving a prison sentence for it. Specifically, defendant testified, "I have manslaughter in my priors." He stated that he "shanked" La, stabbed La four times, and killed La. Defendant also testified he took a "deal . . . for assault with [a] deadly weapon," and that he went to prison after La's death.

24

In sum, defendant admitted the prior manslaughter conviction during his own testimony, rendering any defect in the subsequent stipulation by counsel harmless.  Defendant's admission of the manslaughter conviction and prison sentence through counsel was knowing and intelligent given this record.

D.    *Victim Restitution*

Defendant and the People agree that the abstract of judgment incorrectly stated the amount of victim restitution ordered by the trial court.  The abstract of judgment reflects that the court ordered defendant to pay $75,000 in victim restitution under section 1202.4, subdivision (f).  The court orally imposed a victim restitution fine of $7,500.  Accordingly, we order the abstract of judgment modified to reflect a victim restitution fine of $7,500.  (See *People v. Felix* (2009) 172 Cal.App.4th 1618, 1631 ["the abstract of judgment must be corrected to reflect the trial court's oral pronouncement at sentencing"].)

## IV.  DISPOSITION

The judgment is affirmed.  The abstract of judgment is ordered modified to reflect a victim restitution fine of $7,500. The clerk of the superior court is directed to prepare a modified abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KIM, J.


We concur:


RUBIN, P. J.


MOOR, J.

26